MEADOWLANES LIMITED DIVIDEND HOUSING
ASSOCIATION v CITY OF HOLLAND

Docket No. 86122. Argued October 4, 1990 (Calendar No. 9). Decided
July 16, 1991. Concurring opinion by LEVIN, J., filed July 17,
1991. Rehearing denied 438 Mich 1202.

Meadowlanes Limited Dividend Housing Association, owners of a
federally subsidized low-income housing complex in the City of
Holland, challenged the city's assessment of its property for the
tax years 1981-83. The Tax Tribunal approved the petitioner's
mortgage-equity component formula, adopting its final esti-
mates of true cash value. The Court of Appeals, SHEPHERD, P.J.,
and MAHER and W. R. PETERSON, JJ., reversed in an opinion
per curiam, remanding the case to the tribunal to take into
account the value, if any, of the 5.35 percent mortgage interest
subsidy provided under § 236 of the National Housing Act, 12
USC 1715z-1 (Docket No. 76133). On remand, the tribunal again
adopted the petitioner's method of assessment, but recomputed
the value of the mortgage component to include, rather than
exclude, the value of the § 236 interest subsidy. After remand,
the Court of Appeals, HOOD and R. L. OLZARK, JJ. (DANHOF,
C.J., concurring), affirmed in an opinion per curiam (Docket No.
101787). The association appeals, limited to the issue whether,
in computing the true cash value of real property, the Tax
Tribunal may take into account the value, if any, of a federal
government mortgage subsidy.

In an opinion by Justice BOYLE, joined by Chief Justice
CAVANAGH and Justices BRICKLEY, RILEY, and GRIFFIN, the
Supreme Court held:

Although it is proper for the Tax Tribunal to take into
account the value, if any, of a federal government mortgage
subsidy, the tribunal and the Court of Appeals adopted a wrong
principle by determining the true cash value of the subject real
property under a flawed appraisal method.

1. All factual findings of the Tax Tribunal are final if sup-
ported by competent and substantial evidence. Absent fraud,
appellate courts are limited to determining whether the tribu-
nal made an error of law or adopted a wrong principle. The
basic principles of valuation apply to the assessment of value of
federally subsidized housing complexes in the same manner as

they apply to all real property. Const 1963, art 9, § 3 mandates a uniform system of real property taxation based on the true cash value of the property which could be obtained at a private sale. In determining value, consideration should be given to the advantages and disadvantages of location, quality of soil, zoning, existing use, and the present economic income of structures. The three traditional, acceptable, and reliable methods of determining true cash (or fair market) value are the cost-less-depreciation approach, the sales-comparison (or market) approach, and the capitalization-of-income approach. Whenever possible, all three approaches should be used, and the values correlated, reconciled, and weighed, in order to reach a final estimate of value which reflects the study of all factors influencing the market value of the property. An appraisal which disregards an approach is incomplete.

2. In this case, the Tax Tribunal and the Court of Appeals adopted a wrong principle in deciding that the true cash value of the property could be determined by the mortgage-equity component valuation approach advocated by the petitioner. The touchstone of uniform assessment is the true cash value or usual selling price of the property, not the cash equivalent of that selling price. By discounting the value of the underlying assumable mortgage, the petitioner ignores the principle of leverage which enhances a property's value. The value of the underlying financing in a sales transaction is relevant to the property's true cash value only if the market data shows that the sales price of a comparable property includes consideration of such a feature. In discounting the present cash value of the property's underlying mortgage, the petitioner's appraiser used the cash-equivalency analysis outside its normal application, i.e., that the financing terms of a sale may influence the stated sales price of comparable real property. Nor did he analyze comparable properties for evidence of atypical financing. Further, he erroneously assumed that mortgage assumptions in and of themselves are conclusive evidence of creative financing arrangements between the buyer and seller which would affect the usual selling price and thus require a sales price adjustment. Thus, the petitioner's approach is flawed because it values property by valuing its underlying mortgage in a theoretical commercial paper market which is influenced by the current mortgage interest rate and the stated interest rate, thus violating the constitutional mandate of uniformity in real property taxation. Contrary to basic valuation principles, the petitioner's approach derives a value for ad valorem tax purposes that fails to parallel a likely valuation estimate derived for other purposes. Whatever the circumstances, the numbers

associated with the defined value must be the same. Because the approach involves valuation of the underlying mortgage paper, rather than the property, it has the potential for creating irrational disparities in the true cash value of real property.

3. On remand, the true cash value of the property is to be redetermined using the three traditional valuation approaches. Because interest-subsidy payments made on behalf of the owner-mortgagor of § 236 property affect its usual selling price, it is proper for the tribunal to consider them in the valuation process. The values derived under the various approaches are to be correlated, reconciled, and weighed. Because there is no single correct approach for determining the true cash value of a federally subsidized real property, the appraiser should use variants of all three traditional approaches, valuing the property both as private apartments and as a federally subsidized housing complex, or any other approach that can be demonstrated as accurate and reasonably related to the fair market value.

Justice LEVIN, concurring, stated that although the Tax Tribunal may rely on an approach that takes into account the value, if any, of a federal government mortgage subsidy in the valuation process, and although on remand evidence of an entirely new method of evaluation also may be presented that is accurate and reasonably related to the fair market value or true cash value of the property, "cash value," as used in MCL 211.27(1); MSA 2.27(1), does not mean that a subsidized mortgage that reflects the historical cost rather than the cash value should be included at face value. The lodestar is the usual selling price for cash, and a paper value generally should be reflected at its cash equivalent.

Reversed and remanded.

Justice MALLETT took no part in the decision of this case.

176 Mich App 536; 440 NW2d 71 (1989) reversed.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *Kenneth W. Beall* and *Norman C. Witte*) for the petitioner.

*Cunningham, Mulder & Breese* (by *Andrew J. Mulder*) and *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Peter S. Sheldon, Jeffery V. Stuckey,* and *Kim D. Crooks*), co-counsel, for the respondent.

Amici Curiae:

*Honigman, Miller, Schwartz & Cohn* (by *Thomas J. Beale* and *Frederick M. Baker, Jr.*) for Congresshills Apartments, Builders Association of Southeastern Michigan, and Apartment Association of Michigan.

*Early, Lennon, Fox, Thompson, Peters & Crocker* (by *Richard D. Reed* and *Patricia Mason*) for Michigan Townships Association and Michigan Municipal League.

BOYLE, J. This is a dispute over the assessed value of Meadowlanes Limited Dividend Housing Association's federally subsidized low-income housing complex. The issue before the Court is whether the Michigan Tax Tribunal properly computed the true cash value of petitioner's property for the purposes of assessing ad valorem taxes for the years 1981, 1982, and 1983. We hold that although it is proper for the Michigan Tax Tribunal to take into account the value, if any, of a federal government mortgage subsidy, the tribunal and the Court of Appeals adopted a wrong principle by determining the true cash value of the subject real property under a flawed appraisal method. Thus, we reverse the decisions of the Tax Tribunal and the Court of Appeals and remand this case to the Tax Tribunal for redetermination of the true cash value of Meadowlanes' real property consistent with this opinion.

I

*A. BACKGROUND AND FACTS*

This appeal originated with petitioner-appel-

lant's challenge to the real property tax assessments imposed by the City of Holland on its 22-building, 118-unit, federally subsidized housing complex for the tax years 1981 through 1983.[1]

In 1973, Meadowlanes purchased the housing complex from its original developer, Holland-Zeeland Area Nonprofit Housing Association. It paid $31,532 in cash, contributed $400,000 in equity into reserve accounts, and assumed the complex's underlying mortgage with the Michigan State Housing Development Authority (MSHDA), which carried a 6.35 percent interest rate and had a balance of $2,232,537. MSHDA also approved a $400,000 increase in the mortgage amount so Meadowlanes would have additional funds to correct prior construction defects. Thus, Meadowlanes' total mortgage indebtedness at the time of purchase was $2,624,500.

The Meadowlanes housing complex was financed, built, and operates under § 236 of the National Housing Act, 12 USC 1715z-1; 24 CFR 236.1 *et seq.* It also receives a rental assistance subsidy under § 8 of the United States Housing Act of 1937, 42 USC 1437f, for some of its units.[2] The rent subsidies are not at issue in this appeal. Both of these programs were designed to induce and assist developers in constructing and operating quality housing for low- and moderate-income families.

In return for various benefits, the property

[1] The property's design is modern and attractive, and all but the one-bedroom units are townhouses with basements. It also has a community building, a swimming pool, and a "tot lot." The tenants are lower-income families, many with small children.

[2] Under § 8, the Department of Housing and Urban Development pays directly to the owner of a § 236 property the fair market rental for twenty percent of all units where the rental exceeds fifteen to twenty-five percent of a tenant's annual income. See 42 USC 1437f(C)(1)-(3). In the Meadowlanes complex, twenty percent of the apartments are reserved for § 8 tenants.

owner voluntarily entered into a regulatory agree-
ment which subjects it to federal regulations and
restrictions which include (1) a maximum return
of six percent on initial equity investment in the
property,[3] and (2) rent[4] and operating restrictions.[5]
The Meadowlanes property is also subject to
MSHDA regulations because it is financed with a
MSHDA mortgage.

The benefits that accrue to the owner of a § 236
property include: (1) federal mortgage insurance of
a private, long-term (forty-year) mortgage loan in
an amount not in excess of ninety percent of the
FHA-determined certified cost of the project,[6] and

---

[3] If operating expenses are higher than anticipated, the six percent
owner's equity distribution for that period is decreased or eliminated.
However, the limited rate of return on equity investment is cumula-
tive in the sense that if cash flow does not permit payment of at least
three percent, the deficiency is carried over to a later year when cash
flow is sufficient.

[4] Rent restrictions include both tenant eligibility restrictions and
the amount of rent that can be charged. Tenant eligibility is con-
trolled by income limits determined by HUD regulations. Rent is
limited to a "basic rental charge" or twenty-five percent of the
tenant's income, whichever is higher, but cannot exceed the "fair
market rental." The "basic rental charge" is the rent necessary to
recover operating costs, construction costs, and a limited profit and is
determined as if the project were operated by the owner under a one
percent mortgage. "Fair market rental," on the other hand, is deter-
mined on the basis that the owner received no interest reduction
subsidy. See note, *Low income housing: Section 236 of the National
Housing Act and the Tax Reform Act of 1969,* 31 U Pitt L R 443, 448-
449 (1970).

> The result of the rental formula is that tenants in 236
> projects pay a monthly rental of from 66 to 100% of compara-
> ble market rates, depending on their incomes. [Halperin &
> Tucker, *Low income housing (FHA 236) programs: One of few
> tax shelter opportunities left,* 36 J Taxation 2 (1972).]

[5] Operating restrictions include a prohibition of prepayment of the
mortgage without HUD's consent for twenty years unless the prepay-
ment is to facilitate a sale to a qualified tenant coöperative or
nonprofit group. See Halperin & Tucker, n 4 *supra* at 2-3. Thus, the
property cannot be easily converted to other uses even if the owner
decides another use would be more profitable.

[6] This long-term mortgage for ninety percent of the project's cost

(2) monthly interest reduction payments made by
HUD directly to the private mortgagee-lender on
behalf of the mortgagor-owner for all interest due
under the mortgage in excess of one percent (the
"interest subsidy").[7] 12 USC 1715z-1(c). The Inter-
nal Revenue Code was also amended to provide
several tax benefits.[8]

## B. PROCEEDINGS

Meadowlanes filed a petition with the Michigan
Tax Tribunal, challenging the City of Holland's
assessment of the value of its housing complex for
the tax years 1981 through 1983. Following an
evidentiary hearing, the Michigan Tax Tribunal

creates a

> high loan-to-value ratio . . . enabling a smaller than conven-
> tional equity investment to leverage a higher ratio of deprecia-
> ble basis to equity. Furthermore, the forty year amortization
> period loads the early year payments with a greater component
> of deductible interest than obtains under conventional 20-25
> year financing. [*Pennsylvania v Lynn*, 163 US App DC 288, 305,
> n 57; 501 F2d 848 (1974).]

[7] The project owner contracts with a lender and secures a mortgage
loan bearing interest at the current market rate. HUD then contracts
with the lender to make interest reduction payments each month in
an amount equal to the difference between the payment due under
the mortgage note and what would be required if the note carried a
one percent interest rate. 12 USC 1715z-1(c). See *Graff v Comm'r*, 74
TC 743, 749-750 (1980), aff'd 673 F2d 784 (CA 5, 1982).

In the instant case, the stated mortgage interest rate is 6.35
percent. Meadowlanes pays all the principal owing under the mort-
gage plus one percent of the stated interest. HUD pays the remaining
5.35 percent interest directly to the mortgagee-lender on Meadow-
lanes' behalf.

[8] The tax benefits include: (1) the owner's right to take advantage of
the two-hundred percent double-declining-balance method of deprecia-
tion (§ 167), (2) the owner's right to special treatment regarding
depreciation recapture, i.e., if the property was held for ten years, no
excess depreciation is recaptured in former § 1250(a)(1)(C)(ii), cur-
rently 1250(d)(8), and (3) the owner's right to defer paying taxes on
capital gain from the sale of the project if certain conditions are met
(§ 1039). *Graff, supra* at 750.

For a detailed discussion of the tax incentives associated with § 236
property, see, generally, note, *Tax advantages under section 236 of
the National Housing Act*, 8 Hous L R 911 (1971).

issued its opinion and judgment which determined that the true cash value of the property was $800,000 for 1981, $1,000,000 for 1982, and $1,100,000 for 1983.[9] In reaching its decision, the tribunal approved the valuation approach utilized by Meadowlanes' appraiser, Laurence Allen, and adopted his final estimates of true cash value for the years at issue. Allen described his valuation approach as a variant of the traditional income approach using a "mortgage/equity" component formula.

The city appealed the Tax Tribunal's 1984 decision raising four issues.[10] The Court of Appeals rejected the city's first three arguments, but reversed on the fourth, and remanded the case to the tribunal for reconsideration and directed it to "take into account the value, if any, of the 5.35 percent mortgage interest subsidy." 156 Mich App 238, 252; 401 NW2d 620 (1986) (*Meadowlanes I*).

This Court denied Meadowlanes' application for leave to appeal from *Meadowlanes I* stating: "[T]he Court [is] not persuaded that the questions presented should now be reviewed . . . ." 428 Mich 866 (1987).

On remand, the Tax Tribunal issued a supplementary judgment which once again adopted Meadowlanes' appraiser's mortgage/equity component

[9] See the Tax Tribunal's Supplementary Judgment on Remand, dated January 23, 1987, where it acknowledges that its original opinion contained a typographical error regarding the true cash values of the subject property for the years in question. The error was repeated by the Court of Appeals in 156 Mich App 238; 401 NW2d 620 (1986) (*Meadowlanes I*). The values listed in the text are the corrected figures.

[10] In its appeal, the city challenged (1) the tribunal's allocation of the burden of proof, (2) the tribunal's adoption of Meadowlanes' valuation approach because it was not reasonably accurate and was not supported by proof, (3) the tribunal's approval and use of a valuation method which used a formula involving cash equivalence, and (4) the tribunal's approval and adoption of a valuation method which failed to include the value of the government's interest-reduction subsidy payments in its final calculation of the subject property's true cash value.

method, but recomputed the value of the mortgage component to include, rather than exclude, the value of the § 236 interest subsidy.[11] Thus, the tribunal determined that the true cash value of the subject real property was $1,600,000 in 1981, $1,800,000 in 1982, and $1,900,000 in 1983.[12]

The Tax Tribunal denied the parties' motions to vacate the supplementary judgment and their motions for rehearing. Both parties then appealed in the Court of Appeals.[13] The Court of Appeals affirmed the tribunal's supplementary judgment on remand.[14]

This Court granted Meadowlanes' application for leave to appeal from the Court of Appeals decision after remand in 176 Mich App 536; 440 NW2d 71 (1989) (*Meadowlanes II*), "[l]imited to the issue whether, in computing the true cash value of real property, the Michigan Tax Tribunal may take into account the value, if any, of a federal government mortgage subsidy." 434 Mich 900 (1990).

---

[11] Supplemental Judgment on Remand, Michigan Tax Tribunal, entered January 23, 1987.

[12] On remand, the Tax Tribunal used the same formula to discount the mortgage component under the mortgage/equity method, i.e., the present value of an ordinary annuity. It simply recalculated the mortgage component using the full 6.35 percent interest rate rather than the one percent interest rate originally used to calculate the present value of the property's underlying mortgage paper in the commercial paper market. The net result was an $800,000 increase in the true cash value for each tax year.

[13] The city's appeal focused on the Tax Tribunal's refusal on remand to receive additional evidence bearing on true cash value. Meadowlanes' appeal, on the other hand, focused on the inclusion of the interest-reduction subsidy in the subject property's true cash value.

[14] After remand, the *Meadowlanes II* Court observed that the tribunal did as it was directed on remand.

The tribunal found that, when the mortgage interest subsidy was taken into account, the true cash value of the apartment unit had changed from the tribunal's original figures. This decision . . . is supported by competent and substantial evidence. [176 Mich App 536, 542-543; 440 NW2d 71 (1989).]

II

This case presents issues similar to those addressed by this Court in *Antisdale v City of Galesburg,* 420 Mich 265; 362 NW2d 632 (1984). Once again we must evaluate the ad valorem taxation of a federally subsidized housing complex. Before we can address the issue on which leave was granted, we must first evaluate the valuation method adopted by the Tax Tribunal and the Court of Appeals.[15] This approach deviates from the three traditional approaches to valuation of real property and is proper only if it is accurate and is reasonably related to the fair market value, or true cash value, of the subject real property. *Safran Printing Co v Detroit,* 88 Mich App 376, 380; 276 NW2d 602 (1979); *Presque Isle Harbor Water Co v Presque Isle Twp,* 130 Mich App 182, 190; 344 NW2d 285 (1983).

After we analyze the appropriateness of the valuation approach, we must determine whether, in computing the true cash value of real property, the Tax Tribunal may rely on an approach that takes into account the value, if any, of a federal government mortgage subsidy.

A. APPELLATE SCOPE OF REVIEW

We begin by acknowledging that appellate review of Tax Tribunal decisions, as set forth in Const 1963, art 6, § 28, is limited. All factual findings are final if supported by competent and substantial evidence. When fraud is not alleged, appellate courts are limited to determining

[15] Amici curiae, Michigan Townships Association and the Michigan Municipal League filed a brief and participated at oral argument. The focus of their argument was that the Tax Tribunal and the Court of Appeals adopted a wrong principle when they adopted Meadowlanes' appraiser's method for assessing the true cash value of the Meadowlanes housing complex for the tax years 1981 through 1983.

whether the tribunal made an error of law or adopted a wrong principle. *Antisdale, supra* at 277. Our review here addresses whether the tribunal committed an error of law or adopted a wrong principle by accepting a method of valuation which deviates from the three traditional approaches to value and whether it adopted a wrong principle when it adopted a valuation approach which values the interest reduction subsidy under a § 236 property.

### B. APPLICABLE VALUATION PRINCIPLES

The basic principles of valuation apply to the assessment of value of federally subsidized housing complexes in the same manner as they apply to all other real property. In this case, as in all other appeals from the Tax Tribunal, the fundamental principles concerning ad valorem taxation set out in art 9, § 3 of the Michigan Constitution provide the appropriate analytical framework.[16] This section mandates: (1) that the Legislature is to provide a uniform system of real property taxation, (2) that the tax must be assessed on the basis of the true cash value of the property, and (3) that the Legislature is to provide a determination of true cash value.

The Legislature complied with this constitutional mandate by enacting MCL 211.27(1); MSA 7.27(1), which provides in pertinent part:

"[C]ash value" means the *usual selling price* at

---

[16] Const 1963, art 9, § 3 provides:

The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not . . . exceed 50 percent . . . .

the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale . . . . In determining the value, the assessor shall also consider the advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures . . . . [Emphasis added.]

As evidenced above, the Legislature has provided a broad definition of true cash value and has listed a variety of factors to be considered in the valuation determination. The Legislature did not direct that specific methods be used. Thus, the task of approving or disapproving specific valuation methods or approaches has fallen to the courts. *Antisdale, supra* at 276. This Court has acknowledged that it is

the goal of the assessment process to determine, in the abstract, the usual selling price of a given piece of property between a willing buyer and a willing seller and to develop methodologies that make it possible to achieve uniformity in making such determinations . . . . [*Washtenaw Co v State Tax Comm,* 422 Mich 346, 363; 373 NW2d 697 (1985).]

There are three traditional methods of determining true cash value, or fair market value,[17] which have been found acceptable and reliable by the Tax Tribunal and the courts. They are: (1) the cost-less-depreciation approach,[18] (2) the sales-com-

[17] This Court has ruled that the concepts of "true cash value" and "fair market value" are synonymous in this state. *CAF Investment Co v State Tax Comm,* 392 Mich 442, 450; 221 NW2d 588 (1974).

[18] Under the cost approach, true cash value is derived by adding the estimated land value to an estimate of the current cost of reproducing or replacing improvements and then deducting the loss in value from depreciation in structures, i.e., physical deterioration and functional or economic obsolescence.

parison or market approach,[19] and (3) the capitalization-of-income approach.[20] Variations of these approaches and entirely new methods may be useful if found to be accurate and reasonably related to the fair market value of the subject property.[21] *Antisdale, supra* at 277, n 1. It is the Tax Tribunal's duty to determine which approaches are useful in providing the most accurate valuation under the individual circumstances of each case. *Antisdale, supra* at 277. Regardless of the valuation approach employed, the final value determination must represent the usual price for which the subject property would sell. *Safran Printing, supra* at 380.

Under each approach, the appraiser analyzes data mathematically to determine an estimate of the fair market value of both the physical real estate and all the interests, benefits, and rights inherent in ownership of that real property.[22] All three approaches should be used whenever possible, and an appraisal which disregards an approach by mere statements and without research justifying nonuse is considered incomplete.[23] The values derived under the various approaches are

[19] The sales-comparison approach indicates true cash value by analyzing recent sales of similar properties, comparing them with the subject property, and adjusting the sales price of the comparable properties to reflect differences between the two properties.

[20] The income-capitalization approach measures the present value of the future benefits of property ownership by estimating the property's income stream and its resale value (reversionary interests) and then developing a capitalization rate which is used to convert the estimated future benefits into a present lump-sum value.

An additional description of the three traditional approaches is provided in *Antisdale, supra* at 276-277, n 1.

[21] For discussion of a new appraisal approach, see, generally, Kirk & Smith, *Using the reversion/shelter approach to appraise subsidized housing,* The Appraisal Journal 326 (July, 1983).

[22] American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (9th ed) (Chicago, 1987).

[23] See State Tax Comm Assessor's Training Manual, ch VII, p 34; and *The Appraisal of Real Estate,* n 22 *supra* at 61-75.

correlated, reconciled, and weighed in order to reach a final estimate of value.[24] The ultimate goal of the valuation process is a well-supported conclusion that reflects the study of all factors that influence the market value of the subject property.

## C. VALIDITY OF THE ALLEN "MORTGAGE/EQUITY" COMPONENT APPROACH

Before we can address the interest-subsidy question, we must first evaluate whether the Tax Tribunal and the Court of Appeals adopted a wrong principle when it decided the true cash value of the subject property could be determined by the valuation approach advocated by Meadowlanes' appraiser, Laurence Allen. We hold that the Tax Tribunal and the Court of Appeals did in fact adopt a wrong principle when they determined the true cash value of the Meadowlanes property using Allen's mortgage/equity component approach.

Under this approach, two components of value, an "equity" component and a "mortgage" component, were separately calculated and then separately discounted to present value and finally added together to arrive at the true cash value of the subject property. Allen's "mortgage/equity" component method of valuation is to be distinguished from a variant used under the capitalization-of-income approach. Under the latter approach, the appraiser uses a mortgage/equity technique to develop an overall capitalization rate.

There are two basic steps under the traditional capitalization-of-income approach: (1) calculate net operating income, and (2) develop an appropriate capitalization rate. True cash value is generally

[24] The Appraisal of Real Estate, n 22 supra at 63. After arriving at a value estimate under each approach, the appraiser examines the spread among the various estimates of value. A wide spread may indicate that one or more of the approaches is not truly applicable.

derived by dividing net operating income by the capitalization rate. One method of developing an overall capitalization rate is the "mortgage/equity" method which blends

> six factors . . . together in an algebraic formula. The factors are: (1) Holding period, a limited term of ownership before selling, refinancing or exchanging the property; (2) Equity-yield rate, the rate of return to maturity on dollars actually invested; (3) Loan term, the dollar amount of the mortgage as a percentage of the value or purchase price; (4) Loan term, length of loan in terms of years; (5) Loan interest rate; and (6) Appreciation/depreciation, estimated percentage of possible change in property value within the projected holding period. See I. Johnson, *Instant Mortgage-Equity,* (Lexington, Mass: DC Heath & Co, 1980), p 73. The six component parts are derived from the market that the property falls into . . . . [*Dowagiac Ltd Dividend Housing Ass'n v Dowagiac,* 166 Mich App 232, 239; 420 NW2d 114 (1987).]

The approach described above was originally developed by L. W. Ellwood, an investment analyst, and is "based on the theory that mortgage financing strongly influences real property prices and values"; thus, this factor is considered when developing an overall capitalization rate.[25] Allen's "mortgage/equity" component approach does not follow the Johnson or Ellwood technique. It is not used to derive an overall capitalization rate. Instead, it separately calculates the value of the equity and mortgage components of the real property and then discounts each component separately, using different methods and rates to arrive at their present value.

Under Allen's approach, the owner's equity component is determined by adding together the pres-

---

[25] *The Appraisal of Real Estate,* n 22 *supra* at 554.

ent value of (1) the property's maximum allowed cash flow from operations, which Allen determined was the maximum six percent return on the owner's initial equity investment, (2) the value to the investor of tax shelter benefits, and (3) the value of the property's reversionary interests which the appraiser determined was a negative value in the instant case; thus, he subtracted the anticipated tax cost the owner would incur upon disposition of the property.[26] Each element of the equity component was discounted using a capitalization rate of 20.5 percent.[27]

Under the mortgage component of his valuation approach, Meadowlanes' appraiser simply calculated the cash-equivalent value of the real property's underlying mortgage in the current mortgage paper market assuming it carried a one percent interest rate. He adjusted the mortgage balance ($2,456,207 on December 31, 1982) and derived the value of the mortgage component

> essentially . . . by determining the amount of [cash] a prospective purchaser would need to invest [in a government-insured investment] as of each tax date in order to produce enough income to pay off [Meadowlanes' portion of] the mortgage . . . . [*Meadowlanes I, supra* at 244.][28]

[26] For a description of how these equity features were valued, see *Meadowlanes I, supra* at 246-247.

[27] Applying this method to the subject property, Meadowlanes' appraiser determined the present value of the three elements as follows:

| | | |
|---|---|---|
| $11,712 cash flow × 15 years | = | $ 53,649 |
| 15 years of tax shelter | = | 410,579 |
| Tax cost due at disposition | = | (−19,908) |
| Total Present Value of Equity Component | | $444,320 |

This figure is slightly above the owner's initial equity investment in the property. *Meadowlanes I, supra* at 243-244.

[28] In valuing the mortgage component, Allen considered only that portion of the payments owed by Meadowlanes each month under the

Using this approach, Allen concluded that the value of the mortgage component was $659,000 for 1983. Added together, the mortgage and equity components derived a true cash value for 1983 of $1,100,000.

The mortgage component of Allen's method is premised on the faulty notion that true cash value is not represented by the likely selling price of the subject property if a sale involves the assumption of a low-interest mortgage.[29] Stated otherwise, Allen discounted the value of the assumable mortgage, and assumed true cash value is determined

forty-year mortgage and used an 11.8 percent discount derived from the yield rates in the secondary market for government-insured mortgages. *Meadowlanes I, supra* at 247.

[29] The record reveals that Allen calculated the "likely selling price" of the subject property by adding the present value of the equity component to the mortgage balance. However, he went on to state:

> The projected sale price does not represent the market value or the True Cash Value of the property. The sale involves the assumption of a low interest (1%) mortgage that has a value that is significantly less than the balance. It is necessary to arrive at the True Cash Value indicated by the sale. The mortgage is valued based upon yield rates derived from the sale of government insured mortgages on the open market . . . .

One commentator discussing the treatment of mortgage indebtedness in the valuation of federally subsidized housing complexes has concluded if the property can reasonably be expected to remain current on its existing indebtedness, the property must be worth at least that remaining mortgage balance. Thus, it is inappropriate to discount the remaining indebtedness simply because it carries a below-market interest rate for two reasons:

> 1) The Internal Revenue Code explicitly permits bona fide debt to be taken into depreciable basis or included in value determinations, provided the interest rate it carries is reasonable or is fixed by the government. The favorable financing in subsidized housing transactions originates from the government, so taking it into value at par is correct.
>
> 2) Favorable financing adds value. Unfavorable financing detracts from value. To make a second adjustment to reflect the discounted cost of unfavorable financing, or the discounted value of favorable financing, would in effect be double counting. [Kirk & Smith, n 21 *supra* at 334.]

by the cash or cash equivalent of the likely selling price, i.e., the cash down payment and the cash equivalent value of the assumable mortgage. This approach ignores the fact that the "touchstone of uniform assessment is the true cash value or usual selling price of the property," not the cash equivalent of that selling price. *CAF Investment Co v Saginaw Twp,* 410 Mich 428, 463; 302 NW2d 164 (1981). Allen's approach, in discounting the underlying mortgage paper, also ignores the principle of leverage which recognizes that the ability to invest the smallest amount necessary of one's own funds, borrow the rest, and use the earnings from the purchased property to pay off the loan enhances the subject property's value.[30]

Allen testified that he would not discount a new mortgage. Therefore, under his approach, if the mortgage is new, the true cash value of the real property will reasonably approximate its selling price. If the mortgage is assumed, however, the true cash value of the real property will be the equivalent of its cash down payment added to the discounted value of its underlying mortgage. We find no reason to distinguish, as Meadowlanes appraiser does, between new and assumed mortgages. Carrying Allen's approach to its logical end, the only persons required to pay ad valorem taxes predicated upon a value approaching the usual selling price of their property will be those unfortunate owners who either got new mortgages or paid cash. The resulting lack of uniformity in the assessment of real property for ad valorem tax purposes violates Const 1963, art 9, § 3.

Meadowlanes' appraiser justified discounting the mortgage component by claiming it was necessary to do so to comply with this Court's decision in

---

[30] See *The Appraisal of Real Estate,* n 22 *supra* at 512-513. See also *Pennsylvania v Lynn,* n 6 *supra.*

*Washtenaw, supra.* In *Washtenaw,* this Court held that if market data shows the sales price of a comparable property includes both (1) the value of real property, and (2) the value of a creative or atypical financing arrangement between the buyer and the seller, then the sales price of the comparable property must be adjusted to exclude the value attributable to the creative financing arrangement. Thus, the value of the underlying financing in a sales transaction is relevant to the property's true cash value only if the market data shows that the sales price of a comparable property includes a dollar amount for both of the above features.[31]

In his application of a cash-equivalency analysis in discounting or determining the present cash value of the subject property's underlying mortgage, the appraiser failed to acknowledge several important principles. First, contrary to accepted procedures, Allen used a cash-equivalency analysis outside its normal application, i.e., the sales-comparison approach. The theory behind the concept of cash equivalency is similar to this Court's rationale and holding in *Washtenaw,* i.e., that the financing terms of a sale may influence the stated sales price of comparable real property.[32] Under

---

[31] This Court in *Washtenaw, supra* at 366, n 2, cautioned:

This is not to say that any disparity between an interest rate facilitated by the seller and the prevailing rate will necessarily add to the purchase price. . . . If there is no creative financing effect on sales price, then, of course, the method of valuation need not take it into account.

[32] Cash-equivalency analysis is typically used to adjust the sales price of comparable properties where there is market evidence that the sales price was artificially enhanced by atypical financing terms. Appraisers are cautioned to rigorously test their calculations under this analysis and to remember that the final adjustment must always be derived from the market.

the mortgage component of his "mortgage/equity" approach, however, Allen did not analyze comparable properties for evidence of "atypical" financing. Instead, Allen erroneously assumed that mortgage assumptions in and of themselves are conclusive evidence of creative financing arrangements between the buyer and seller which affect the property's usual selling price and thus require that a sales price be adjusted.

Second, under this cash-equivalency analysis, Meadowlanes' appraiser violated a basic principle under the comparable-sales approach by adjusting the value of the subject property rather than the sales price of a comparable property. To elaborate, under the sales-comparison approach, true cash value is derived by analyzing recent sales of similar properties, comparing those properties with the subject property, and adjusting the sales price of the comparable properties to reflect differences. The adjusted sales prices should fall within a range and allow the appraiser to estimate the true cash value of the subject property. Once ascertained, the true cash value of the subject property itself is *not* adjusted.

As evidenced above, Allen's approach is flawed because it values the property in large part by valuing its underlying mortgage in a theoretical commercial paper market. The primary and overriding influence in this method of valuation is the current mortgage interest rate. The second most important value influence is the stated interest

---

*The Appraisal of Real Estate,* n 22 *supra* at 319, discusses the cash equivalency analysis and provides:

Estimating cash equivalency employs direct market evidence to make the appropriate adjustments. The appraiser tries to locate sales with and without atypical financing, makes adjustments for other items, and attributes the remaining differential to the financing terms. This method can be used as a guide if substantial data on transactions with and without special financing are available.

rate on the property's underlying mortgage note. By placing such great weight on the discounted value of the underlying mortgage note, two identical properties, one built at a time when interest rates are high and the other when interest rates are low will have vastly disparate estimates of value under Allen's approach. Thus, it violates the constitutional mandate of uniformity in real property taxation.[33]

We find further evidence that Allen's valuation approach is flawed because it derives a value for ad valorem tax purposes that fails to parallel a likely valuation estimate derived for other purposes, i.e., a sales price, financing, insurance, calculating net worth in a financial statement, or federal income tax purposes. This is contrary to basic valuation principles which emphasize the appraisal conclusion, i.e., the estimate of value, is not adjusted to accommodate the use of the appraisal. "Whatever the circumstances, the numbers associated with the defined value [i.e., market value] will be the same."[34] In fact, in the context of federally subsidized housing, the tax courts and the Internal Revenue Service generally require independent verification that the purchase price does not exceed the property's market value as a means of ensuring that the buyer is not overpaying so that he may take inflated tax deductions.[35] With this in mind, we note that the Meadowlanes housing complex did sell in 1984 for $3.7 million.[36]

[33] Meadowlanes erroneously claims that the disparity is related to the tribunal's use of the note's stated 6.35 percent interest rate. This phenomenon, however, is mathematical and results strictly from valuing the mortgage paper rather than the real property. It occurs under either Allen's original approach or the modification of that approach applied by the Tax Tribunal on remand.

[34] *The Appraisal of Real Estate,* n 22 *supra,* p 9.

[35] See Kirk & Smith, n 21 *supra,* p 327.

[36] The consideration for the sale included $700,000 in cash, assump-

For the above reasons, we find that the portion of Meadowlanes' appraiser's approach which values the mortgage is flawed.[37] Thus, the Tax Tribunal adopted a wrong principle by using Allen's "mortgage/equity" component approach in determining the true cash value of the subject property. This approach makes a number of invalid assumptions allowing it to value in large part the underlying mortgage paper rather than the real property. In so doing, it has the potential for creating irrational disparities in the true cash value of real property and thus violates the constitutional mandate of uniformity in the assessment of ad valorem taxes.

### D. THE INTEREST-REDUCTION SUBSIDY

Under his valuation approach, Meadowlanes' appraiser did not take into account the $8,520.74 portion of the monthly mortgage payments which represented the interest subsidy paid by HUD to the mortgagee-lender.[38] Initially, the Tax Tribunal also excluded the interest subsidy from its final estimate of the subject property's true cash value. However, on remand, the tribunal recalculated its final valuation of the property, taking into account the interest subsidy under the mortgage component of the Allen method.

Meadowlanes claims the tribunal adopted a wrong principle when it adopted a valuation ap-

tion of the $2,423,242 million mortgage balance, and a promissory note in the amount of $650,000 for a total sales price of $3,733,242 (sic). 26 Michigan Assessor, August, 1985, No. 8, p 20.

[37] We express no opinion regarding the validity of the equity component of Allen's "mortgage/equity" component method.

[38] Meadowlanes' appraiser excluded the subsidy amount because (1) he concluded the interest-reduction subsidy was an intangible and thus not properly included in the value of real property, and (2) it was a benefit which flowed to the tenants and not the owner of the real property.

proach which took into account the value of a federal government mortgage interest subsidy available to it as a § 236 property owner. We have concluded that the tribunal did adopt a wrong principle when it used Meadowlanes' appraiser's valuation approach. However, this does not end our discussion. We find it necessary to answer the issue on which leave was granted.

On remand, the true cash value of the subject property is to be redetermined using the three traditional valuation approaches. We recognize that the tribunal when evaluating the value estimates derived under these approaches, especially the capitalization-of-income approach, will once again be faced with the issue whether it is appropriate to consider the value, if any, of the interest subsidy. We hold, similar to our decision in *Antisdale, supra* at 285, that because the interest-subsidy payments made on behalf of the owner-mortgagor of the § 236 property affect the usual selling price of the property, it is proper for the Tax Tribunal to consider those payments in the valuation process.

In *Antisdale,* this Court addressed the true cash value of property similar to the Meadowlanes housing complex and focused on the legislative definition of true cash value in MCL 211.27(1); MSA 7.27(1). We noted that that statute lists a number of value-influencing factors such as zoning and location that should be considered when determining the "usual selling price" of real property. In particular, we recognized that although these factors are intangibles, and not taxable in and of themselves, they can increase or decrease the value of property. We concluded that tax shelter benefits are also value-influencing factors and, although intangibles, should be reflected in the assessment process to the extent that they in-

crease or decrease the value of the subject real property. *Antisdale, supra* at 284-285.

Similarly, although the mortgage-interest subsidy is an intangible, and not taxable in and of itself, it is a value-influencing factor. In *Antisdale, supra* at 284, we recognized that without the subsidy these types of properties would not exist. Therefore, the value of the subsidy, if any, should be reflected in the assessment process. We agree with the *Meadowlanes I* Court's conclusion:

> Just as tax benefits affect the selling price of federally subsidized property, so does the existence of an interest subsidy attached to a mortgage being assumed by the purchaser. [*Id.* at 250.]

As clarified above, the subsidy is not taxed in and of itself. It is merely an intangible value influencer to be considered in the valuation and assessment process in the same manner as tax benefits, location, zoning, and other intangible value influences. Thus, Meadowlanes missed the point when it argued that consideration of the value of the mortgage interest subsidy in the assessment process constitutes double taxation.

We also reject Meadowlanes' argument that the subsidy does not affect the value of the real property because the owner of a § 236 property derives no benefit from it. The interest subsidy reduces the property's total operating costs and adds value by increasing the amount of debt the property can carry.[39] Thus, it makes lower rents possible and allows the owner of § 236 property to take advantage of a highly leveraged rate of return on his equity investment in addition to reaping a number

---

[39] See Kirk & Smith, n 21 *supra,* p 329.

of tax shelter benefits.[40] Despite the fact that the
tenants benefit from the subsidy in the form of
reduced rent, the statutory language creating the
interest subsidy clarifies that the government's
payment of all interest in excess of one percent (in
this case $8,520.74 per month) is a considerable
benefit to the owner of § 236 property.[41]

Meadowlanes also supported its position by erro-
neously claiming that the subsidy is not income
taxable to the owner.[42] In *Graff v Comm'r*, 74 TC
743 (1980), aff'd 673 F2d 784 (CA 5, 1982), the
United States Tax Court specifically concluded
that the interest reduction payments made by HUD
on behalf of a § 236 property owner were taxable
to the owner as income.[43] The *Graff* court found
that the interest reduction payments "took the
place of rents that otherwise would have been
charged the tenants. As such, the payments were a
substitute for rent." *Graff* at 757. Thus, recogniz-
ing their value to the property owner, the Tax
Court held that the interest subsidy amount is
both includable as income and deductible as an
interest expense for federal income tax purposes.[44]
Since the benefits of the subsidy inure to the

[40] See *Pennsylvania v Lynn*, n 6 *supra*. See also *Graff, supra* at 753-754.

[41] See 12 USC 1715z-1(a), (c), and (e).

[42] Meadowlanes relies on a Massachusetts case, *Morville House, Inc v Comm'r of Corp & Taxation*, 369 Mass 928; 344 NE2d 878 (1976), which was criticized by the Tax Court in *Graff, supra* at 757-758.

[43] After reviewing the legislative history, operation, incentives, and restrictions of § 236 properties, the *Graff* court disagreed with the argument that the owner received no benefit from the interest subsidy. The court observed, at 752-753:

> When HUD undertook to, and did make, part of such pay-
> ments on his behalf, he benefited as the owner of the project,
> and he benefited since he was relieved of his legal obligation to
> make such payments. The receipt of such benefits causes such
> payments to be includable in his gross income.

[44] Accord Rev Rul 76-75, 1976-1 CB 14.

owner, their value is properly considered in the determination of the true cash value of the subject real property.

Furthermore, contrary to Meadowlanes' assertions, the term "creative financing" as defined by this Court in *Washtenaw, supra,* does not include the federal interest subsidy simply by virtue of its presence in a program designed to induce private construction and operation of low-income housing projects. The *Meadowlanes I* Court did not err when it found that the interest subsidy was closer in nature to value-influencing factors such as property tax and typical costs of borrowing which are appropriately considered in the valuation process. *Meadowlanes I, supra* at 250.

In the instant case, the appraiser's decision to exclude the subsidy was not based on market-data evidence of sales of similar properties where the sales price required adjustment to exclude consideration given for an atypical financing arrangement between the buyer and seller. To the contrary, the interest subsidy applies to all § 236 property and is transferable. This is not a negotiable term that would allow a seller to extract an artificially enhanced price upon a sale. Thus, Meadowlanes' reliance on *Washtenaw* in this context is misplaced.

A survey of decisions from other jurisdictions supports our conclusion that it is appropriate to consider the federal interest subsidy in the computation of value for real property tax purposes. For example, in *Rebelwood, Ltd v Hinds Co,* 544 So 2d 1356 (Miss, 1989), the taxpayer-owner of a federally subsidized low-income housing complex challenged its assessed value for property tax purposes. The *Rebelwood* court emphasized that the valuation process must consider any circumstance that tends to affect the real property's value. It found

that both the § 8 rent and § 236 mortgage interest subsidies were to be considered in the valuation process since they were transferable and they made ownership of the property more desirable than it would be without them.[45]

Several other jurisdictions have determined that rent subsidies affect the value of federally subsidized housing complexes because (1) they affect its income-earning capacity, and (2) since they are transferable, they will be considered by a willing buyer and seller when determining fair market value. Thus, these courts have concluded that the rent subsidy must be considered in the valuation process.[46] The same rationale applies to the interest-reduction subsidy since its availability makes the § 236 property economically feasible and desirable.[47]

An overriding theme in the decisions addressing the ad valorem taxation of federally subsidized real property is that the valuation process must consider both the positive and negative aspects of

[45] Rebelwood, supra at 1365.

[46] Kankakee Co Bd of Review v Property Tax Appeal Bd, 163 Ill App 3d 811; 516 NE2d 1006 (1987), aff'd 131 Ill 2d 1, 16-17; 544 NE2d 762 (1989), Executive Square Ltd Partnership v Bd of Tax Review, 11 Conn App 566; 528 A2d 409 (1987), Kargman v Jacobs, 411 A2d 1326 (RI, 1980), and Lake Co Bd of Review v Property Tax Appeal Bd, 172 Ill App 3d 851; 527 NE2d 84 (1988). In these cases, the various courts held that it was appropriate to consider actual rents rather than hypothetical market rents because the actual rent with the rent subsidy was higher than market rents. Thus, the actual rents were a better indication of the property's true earning capacity.

In Royal Gardens Co v Concord, 114 NH 668; 328 A2d 123 (1974), and Community Development Co v Bd of Assessors, 377 Mass 351; 385 NE2d 1376 (1979), the courts held that the valuation process must consider the actual rents received. The difference in these cases, however, is that the actual rents were lower than market rents.

Two panels of the Court of Appeals have also held that it is appropriate to consider rent subsidies in the valuation process. See Dowagiac Ltd Dividend Housing Ass'n v Dowagiac, 166 Mich App 232; 420 NW2d 114 (1987), and Comstock Village Ltd Dividend Housing Ass'n v Comstock Twp, 168 Mich App 755; 425 NW2d 702 (1988).

[47] Rebelwood, supra at 1365; Graff, supra at 753-754.

the regulatory agreement voluntarily entered into between the owner and the government. This comports with the well-established rule that all factors relevant to property value should be considered in the assessment process.[48] Thus, we note that the *Meadowlanes I* Court was correct in emphasizing:

> Section 236 properties are subject to unique restrictions and advantages. All of them, including the subsidized interest feature, must be at least considered in the assessment process. [*Meadowlanes I, supra* at 251.]

Finally, we reject the argument advanced by amici curiae on Meadowlanes' behalf[49] that consideration of the interest subsidy in the valuation process frustrates public policy. Other courts have considered and rejected this same argument. After reviewing the relevant statutory scheme and legislative history, these courts have concluded there is no indication Congress intended to create subsidies by local units of government in addition to the significant economic incentives it provided to induce private developers to construct and operate quality low-income housing.[50] The Tax Tribunal

---

[48] *Steele v Allenstown,* 124 NH 487, 492; 471 A2d 1179 (1984) (citing *Royal Gardens, supra* at 671-672). See also *In re Appeal of Johnstown Associates,* 494 Pa 433; 431 A2d 932 (1981).

[49] Amici curiae Congresshills Apartments, Builders Association of Southeastern Michigan, and Apartment Association of Michigan in favor of petitioner Meadowlanes.

[50] *Lake Co Bd of Review v Property Tax Appeal Bd,* n 46 *supra,* quoting *Kankakee Co Bd of Review v Property Tax Appeal Bd,* 163 Ill App 3d 811, 818; 516 NE2d 1006 (1987), aff'd 131 Ill 2d 1; 544 NE2d 762 (1989):

> [A]doption of a method of appraisal that ignores the subsidized nature of a project such as Riverwoods Apartments . . . "would amount to a judicially-mandated project subsidy by local government, beyond that which legislative policy has established."

has also considered and rejected this public policy argument in the context of a § 236 property.[51]

For the above reasons, we hold that in computing the true cash value of real property, the Michigan Tax Tribunal may take into account the value, if any, of a federal government mortgage subsidy. We affirm those portions of the decisions of the Tax Tribunal and the Court of Appeals in *Meadowlanes I* and *Meadowlanes II* that comport with this ruling.

III

Although the tribunal and the Court of Appeals correctly considered the value of the interest subsidy, they did so using a flawed method. Thus, we affirm in part, reverse in part, and remand to the Tax Tribunal for a new hearing.

We direct that on remand, the tribunal be presented with factually supported estimates of the fair market value of the Meadowlanes property derived from the three recognized valuation approaches: (1) the replacement-cost-less-depreciation

See also *Rebelwood, supra* at 1365, *Graff, supra* at 755, *In re Appeal of Johnstown Associates,* n 48 *supra,* and *Pinelake Housing Cooperative v Ann Arbor,* 159 Mich App 208, 228-229; 406 NW2d 832 (1987), where a panel of the Court of Appeals rejected a similar public policy argument on the basis that the mere fact the federal government subsidizes these housing projects is not sufficient reason to require cities and townships where they are located to bestow an additional subsidy in the form of reduced property taxes.

[51] In *Kentwood Apartments v Kentwood,* 1 MTTR 295, 301 (1977), the tribunal stated in relevant part:

To the extent that federal income tax receipts are utilized to subsidize the owners and tenants of Petitioner's property, the citizens of the City . . . are already contributing to the support of subject property, albeit indirectly. As such, there is no logical or legal reason why the citizens . . . should be expected or required to further subsidize such property by means of externally imposed property tax relief.

approach, (2) the market or comparison-sales approach, and (3) the capitalization-of-income approach. These traditional approaches are based on concepts that apply to subsidized housing complexes just as they apply to other types of real property. A survey of relevant decisions in other jurisdictions reveals reliance on these three recognized approaches.[52] Evidence of an entirely new method of valuation may also be presented, but it must be demonstrated to be accurate and reasonably related to the fair market value of the subject property.

The values derived under the various approaches are to be correlated, reconciled, and weighed in order to reach a final estimate of value. It is the Tax Tribunal's duty to determine which approaches provide the most accurate valuation under the individual circumstances of each case. An appraisal approach is to be disregarded only if there is research justifying its nonuse. In addition, the final estimate of true cash value must represent the physical real estate and all the interests, benefits, and rights inherent in ownership of the subject real property.

With these basic principles in mind, we acknowledge that there is no single correct approach for determining the true cash value of federally subsidized real property. Therefore, the appraiser should use variants of all three traditional approaches, valuing the property both as private apartments and as a federally subsidized housing complex. Also, any other approach demonstrated to be accurate and reasonably related to the fair market value of the subject property is acceptable. We believe it is best to provide the tribunal with all the relevant data so as to allow it to compare,

[52] See *Rebelwood, supra* and cases cited in ns 46 and 48.

correlate, and reconcile the information and make an informed decision.

Thus, on remand, the tribunal is to be presented with value estimates using (1) the cost approach, valuing the real property as subsidized; (2) the cost approach, valuing the real property as private apartments; (3) the capitalization-of-income approach, using all figures and valuing the real property as subsidized and considering the risk, leverage and yield to maturity factors that are developed from the subsidized housing market; (4) the capitalization-of-income approach, valuing the real property as a private housing complex; (5) the sales-comparison approach, using subsidized properties as comparables; (6) the sales-comparison approach, using private housing complexes or apartments as comparables; and (7) other new approaches.

When using approach (1), economic or external obsolescence should be calculated, recognizing that the real property is devoted to its highest and best use as subsidized housing property. If there is a market for subsidized housing at the location where it is built and a sufficient number of individuals who can afford to pay the rent required, then there will be little economic obsolescence under this approach. Finally, when using a sales-comparison approach, the appraiser should adjust the sales price of comparables for differences in size, age, condition, location, and other value influences that buyers and sellers of real property take into account as opposed to the value influences considered by buyers and sellers of commercial paper.

We reverse the decisions of the Tax Tribunal and the Court of Appeals and remand the case to the tribunal for a redetermination of the true cash value of the subject real property in a manner consistent with this opinion.

CAVANAGH, C.J., and BRICKLEY, RILEY, and GRIFFIN, JJ., concurred with BOYLE, J.

The following opinion was filed with the Clerk of the Supreme Court on July 17, 1991, after the release of the opinion of the Court on July 16, 1991—REPORTER.

LEVIN, J. I concur in the majority's response to the question on which this Court granted leave to appeal that on the remand ordered by the majority "the Tax Tribunal may rely on an approach that takes into account the value, if any, of a federal government mortgage subsidy"[1] or that it would be "proper for the Tax Tribunal to consider those payments in the valuation process."[2]

I also concur that on remand evidence of an entirely new method of evaluation may also be presented that is "accurate and . . . reasonably related to the fair market value"[3] or "true cash value"[4] of the property.

Although the statute provides that "cash value" means the "usual selling price" at "private sale,"[5] that does not mean that a subsidized mortgage that reflects the historical cost rather than the cash value should be included at face value. The lodestar is the usual selling price for cash, and a paper "value" should generally be reflected at its cash equivalent. Leverage and tax benefits might add to the cash value if the cash equivalent of all paper values exceeded the usual selling price for cash.

An insurance "value" reflects replacement cost not the true cash value or usual selling price for cash, and "values" set forth in a financial statement or for federal income tax purposes generally

[1] *Ante,* p 482.

[2] *Ante,* p 495.

[3] *Ante,* pp 482, 502.

[4] *Ante,* p 482.

[5] MCL 211.27(1); MSA 7.27(1) quoted *ante,* pp 483-484.

reflect historical cost less depreciation, and often are unrelated to true cash value or the usual selling price.

Uniformity is achieved by valuing all assessable property at the same proportion of true cash value or the usual selling price for cash.

Whatever may be the flaws in the Allen appraisal, the foregoing principles are, in general, immutable.

In all events, I am inclined to believe, subject to being persuaded otherwise, that the true cash value cannot exceed the usual selling price for cash were the property no longer subsidized and no longer subject to the restrictions and benefits of a § 236 project with a rental assistance subsidy under § 8 and whatever restrictions MSHDA may have imposed.

MALLETT, J., took no part in the decision of this case.