HURON RIDGE LP v YPSILANTI TOWNSHIP

Docket No. 263495. Submitted December 4, 2006, at Lansing. Decided March 27, 2007, at 9:00 a.m.

Huron Ridge LP filed a petition in the Michigan Tax Tribunal to appeal property tax assessments levied by Ypsilanti Township against an apartment complex it owned. The Tax Tribunal granted Ypsilanti Township's motion for partial summary disposition after concluding that the federal tax credits Huron Ridge received for the apartment complex pursuant to a low-income housing program should be included when determining the property's true cash value. The petitioner appealed.

The Court of Appeals *held*:

1. The uniformity requirement of the Michigan Constitution is not violated by the use of property tax appraisal methods that take into account the value of benefits accruing to owners of properties regulated under federal subsidized housing programs. The most relevant factor in determining a property's true cash value is the property's highest and best use, and, as the petitioner agreed, the highest and best use of the property at issue is as a subsidized low-income housing project. The petitioner's claim that the property might have to be sold for a price comparable to property without tax credits was speculative. Accordingly, the Tax Tribunal did not err in attributing value to the tax credits when assessing the true cash value of the property.

2. The Tax Tribunal properly considered the tax credits in determining the true cash value of the property despite the fact that the tax credits are intangibles. In Michigan, while intangibles are not taxable in and of themselves, they may be taken into account for purposes of assessing the value of tangible property, and the fair market value of federally subsidized housing projects is primarily driven by the tax credits. Accordingly, the appraised value of the property for tax purposes would be artificially depressed if the value of the tax credits were not included. While it could be argued that tax credits should be excluded for public policy reasons when assessing subsidized low-income housing projects, such arguments must be addressed to the Legislature rather than the courts.

Affirmed.

1. TAXATION — PROPERTY TAX — FEDERAL TAX CREDITS — UNIFORMITY REQUIRE-
MENT.

    The uniformity requirement of the Michigan Constitution is not
violated by the use of property tax appraisal methods that take
into account the value of benefits accruing to owners of properties
regulated under federal subsidized housing programs (Const 1963,
art 9, § 3; MCL 211.27[1]).

2. TAXATION — PROPERTY TAX — FEDERAL TAX CREDITS — INTANGIBLES.

    Tax credits are properly considered when determining the true cash
value of federally subsidized housing projects despite the fact that,
as intangibles, the tax credits themselves are not taxable (MCL
211.27[1]).

*Honigman Miller Schwartz and Cohn LLP* (by
*Michael B. Shapiro, Daniel L. Stanley,* and *Mark A.
Burstein*), for the petitioner.

*McLain & Winters* (by *Angela B. King*) for the
respondent.

Before: MARKEY, P.J., and SAAD and WILDER, JJ.

SAAD, J. Petitioner appeals the Michigan Tax Tri-
bunal's decision that established the true cash value
of an Ypsilanti low-income apartment complex, Hu-
ron Ridge Apartments, and assessed taxes for tax
years 2002, 2003, and 2004. For the reasons stated
below, we affirm.

I. FACTS

    Petitioner, Huron Ridge LP is the limited partnership
that owns Huron Ridge Apartments, which is allotted
credits under the Federal Low Income Housing Tax
Credit Program pursuant to § 42 of the Internal Rev-
enue Code. Petitioner contends that the Tax Tribunal
erred by including the value of the low-income housing
tax credits authorized by IRC § 42 in the true cash value

of the property. In the § 42 program, the low-income housing developer is allocated tax credits for ten tax years, the developer generally uses the tax credits to recruit private investors, and the investors are assigned the tax credits in exchange for the investors' contribution of capital to build or rehabilitate the housing project.[1] Here, the apartment complex was assigned $13,590,490 in tax credits for tax years 2001 to 2010. For the three tax years at issue here, petitioner received annual credits of $1,359,049.

On June 21, 2002, petitioner petitioned the Tax Tribunal for a reduction of the property's tax year 2002 taxable value from $5,024,463 to $2,250,000. The parties filed cross-motions for partial summary disposition on the issue whether the tax credits are value-influencing factors that must be considered in the valuation process. The Tax Tribunal granted respondent Ypsilanti Township's motion for partial summary

---

[1] Generally, as here, the sale of the tax credits is structured as a limited partnership between the developer and the investors. The limited partner investors purchase the limited partner interests in the ownership of the development in return for the tax credit benefits expected to be realized in the ten-year period.

In exchange for the tax credits, the Michigan State Housing Development Authority (the designated housing credit agency for the allocation of the federal low-income housing tax credits) requires an agreement that the developer/owner will maintain tenant income eligibility restrictions and rent restrictions for at least 18 years. Under the federal tax code, the regulatory agreement creates a restrictive covenant that runs with the land. IRC § 42(h)(6). If the original owner or its successor ceases to operate the development as low-income housing under the terms of the regulatory agreement, the value of the tax credits is reduced or entirely recaptured. IRC § 42(j). On the other hand, as long as the subsequent owner continues to operate under the regulatory agreement, it is entitled to receive the remaining tax credits. IRC § 42(d)(7)(A). Here, petitioner entered into a regulatory agreement on December 20, 2000. Petitioner agreed to devote 100 percent of the units in the newly built complex to low-income housing.

disposition on October 11, 2004. The parties entered into a stipulation of facts in lieu of a formal evidentiary hearing on valuation, though petitioner preserved the right to appeal the Tax Tribunal's final order. The final order of the Tax Tribunal adopted the factual findings of the parties and the legal conclusions of the October 11, 2004, order. The parties agreed that the appropriate appraisal method for the property was the income method. The Tax Tribunal agreed with the parties that "the most applicable method within the income approach is a discounted cash flow analysis in which the combined cash flows from operation of the subject property and the unallocated (remaining) [tax credits] are discounted to a present value as of each date of valuation." Under this method, the value of the remaining tax credits diminishes with each year until the credits are exhausted in year 11. For tax year 2002, the stipulated true cash value of the property was $13,120,300 with a taxable value of $5,024,463. For tax year 2003, the stipulated true cash value was $11,904,500 with a taxable value of $5,099,829. For tax year 2004, the parties only stipulated a taxable value of $5,217,125. Petitioner now appeals the Tax Tribunal's decision to include the tax credits in the property valuations.

## II. ANALYSIS

### A. TRUE CASH VALUE, UNIFORMITY REQUIREMENT, AND USE-VALUE APPROACH

Petitioner claims that the value of the tax credits should not be attributable to the value of the property and argues that, to the extent that there is ambiguity regarding whether the tax credits may be included in "true cash value," that ambiguity must be construed in favor of the taxpayer. Our Supreme Court has held that,

if a term within a tax statute was clearly intended by the Legislature to sweep broadly, it must be given a practical construction. See *Michigan Bell Telephone Co v Treasury Dep't*, 445 Mich 470, 478-479; 518 NW2d 808 (1994).

> It is clearly within the competence of the legislature to sweep within its taxable orbit all kinds of property and any and all interests therein.
>
> * * *
>
> While [tax statutes] will not be extended by implication, . . . neither will the words thereof be so narrowly interpreted as to defeat the purposes of the act. [*In re Brackett Estate*, 342 Mich 195, 205; 69 NW2d 164 (1955).]

"If the language of the statute is clear and unambiguous, then no further interpretation is required. However, judicial construction is appropriate when reasonable minds can differ with regard to the meaning of the statutory language." *Benedict v Dep't of Treasury*, 236 Mich App 559, 563; 601 NW2d 151 (1999) (citation omitted).

"True cash value" is a constitutional term used in Const 1963, art 9, § 3:

> The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property . . . . The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed . . . ; and for a system of equalization of assessments.

The statutory definition of "true cash value," provided by MCL 211.27(1), is "the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that

could be obtained for the property at a private sale," as opposed to an auction or forced sale. The Legislature has provided guidelines for the determination of true cash value as follows:

> In determining the true cash value, the assessor shall also consider the advantages and disadvantages of the location; quality of soil; zoning, existing use; present economic income of structures, including farm structures; present economic income of land if the land is being farmed or otherwise put to income producing use; quantity and value of standing timber; water power and privileges; and mines, minerals, quarries, or other valuable deposits known to be available in the land and their value. [MCL 211.27(1).]

On the basis of this broad statutory definition, our Supreme Court has determined that "true cash value" is synonymous with "fair market value." *CAF Investment Co v State Tax Comm*, 392 Mich 442, 450; 221 NW2d 588 (1974). Therefore, the assessment must reflect the probable price that a willing buyer and a willing seller would arrive at through arm's length negotiation. See *Safran Printing Co v Detroit*, 88 Mich App 376, 382; 276 NW2d 602 (1979).

MCL 211.27(1) does not mandate a single method to arrive at the true cash value. Our Supreme Court recognizes certain appraisal methods, including the income method used in this case, as the traditionally favored methods of calculating a property's true cash value. However, "[a]ny method which is recognized as accurate and reasonably related to fair market valuation is an acceptable indicator of true cash value." *Safran, supra,* 88 Mich App at 380. "It is the duty of the Tax Tribunal to select the method which is the most accurate after considering all the facts before it." *Clark Equip Co v Leoni Twp*, 113 Mich App 778, 781-782; 318 NW2d 586 (1982). As a result of the broad legislative

definition, "it has fallen to the courts to approve or disapprove of specific methods of determining true cash value, guided by those available expressions of legislative intent." *Antisdale v City of Galesburg*, 420 Mich 265, 276; 362 NW2d 632 (1984).

As noted, petitioner objects to the appraisal method of determining true cash value because it includes the federal income tax credit authorized by IRC § 42. However, petitioner's argument that this method violates the uniformity requirement of the Michigan Constitution has been rejected by our Supreme Court in prior cases that addressed analogous federal housing subsidy programs. For example, in *Antisdale, supra,* 420 Mich at 268-270, the Court considered whether the financing terms of mortgages provided by the Farmers Home Administration (FmHA) program should be a factor in the determination of the true cash value of an apartment complex subsidized under that program. The FmHA loaned the complex's developers the required funds at a subsidized 1 percent annual interest rate. *Id.* at 269. The Tax Tribunal hearing officer concluded that including the value of financing terms in the property assessment violated the uniformity requirement. The hearing officer reasoned that no exception to the general rule excluding financing terms should be made for this type of federal subsidy because, " '[i]f exceptions are carved out . . . where only a minute segment of comparable properties have this particular financing arrangement, the "usual sale" requirement would become so diluted as to render the term meaningless.' " *Id.* at 273. However, the Tax Tribunal subsequently rejected the hearing officer's legal conclusion. *Id.* at 273. This Court affirmed the Tax Tribunal and rejected the argument that "physically identical properties in comparable locations must receive identical valuations in spite of different financial conditions." *Antisdale v*

*City of Galesburg,* 109 Mich App 627, 633; 311 NW2d 432 (1981), rev'd 420 Mich 265 (1984).

Our Supreme Court affirmed the Tax Tribunal's decision to value the subsidy, though it reversed its decision to use a particular method of calculation. *Antisdale, supra,* 420 Mich at 286. The Supreme Court reasoned that "[t]he foremost value of these [subsidized] properties is found in the tax benefits they generate to the owner." *Id.* at 285. Therefore, the Supreme Court held that tax benefits should be reflected in the valuation to the extent that they increase or decrease the value of the real property. *Id.* In reaching its conclusion, the Supreme Court rejected the respondent's contention that the outstanding balance on the subsidized mortgage had a dollar-for-dollar relationship to the complex's true cash value because " '[a]lthough some intangible assets are equivalent to their face values, many are not.' " *Id.* at 281 (citation omitted). The exact amount that the subsidized mortgage contributed to the value of the property beyond its face value remained a question of fact for the Tax Tribunal to determine on remand. *Id.* at 286.

Our Supreme Court approved a similar appraisal approach in *Meadowlanes Ltd Dividend Housing Ass'n v City of Holland,* 437 Mich 473, 496; 473 NW2d 636 (1991). Petitioner cites *Meadowlanes* for the proposition that the Supreme Court rejected the use of an appraisal method based on the low interest rate authorized by § 236 of the National Housing Act, 12 USC 1715z-1. While the Court rejected much of the appraisal method used by the Tax Tribunal, the Court held that the Tax Tribunal's consideration of the value of the subsidy did not frustrate public policy and that the value of the subsidized mortgage must be reflected in the assessment. *Meadowlanes, supra* at 501-502.

Reversal of the Tax Tribunal decision was necessary because the tribunal used a "flawed method" of measuring the effect of the subsidy on the true cash value. *Id.* at 501. The error requiring reversal in *Meadowlanes* was the misapplication of a cash-equivalency analysis. The Court explained that a "[c]ash-equivalency analysis is typically used to adjust the sales price of comparable properties where there is market evidence that the sales price was artificially enhanced by atypical financing terms." *Id.* at 491 n 32. The method used by the taxpayer's appraiser, which the Tax Tribunal adopted, put "such great weight on the discounted value of the underlying mortgage note" that it violated the uniformity requirement. *Id.* at 480, 493. The error, which was committed by the taxpayer's appraiser, was unrelated to the error that the taxpayer actually alleged against the Tax Tribunal. The taxpayer appealed the Tax Tribunal's decision to include the value of the § 236 mortgage interest subsidy in the property's true cash value. The Court treated the taxpayer's appeal as a separate issue only after concluding that the Tax Tribunal adopted a wrong principle by adopting the cash-equivalency analysis of the taxpayer's appraiser. *Id.* at 494-495.

The *Meadowlanes* Court ordered the Tax Tribunal, on remand, to compare the taxpayer's subsidized property to the value of identical buildings without interest subsidies. *Id.* at 502-503. Here, petitioner argues that this order proves that, even under *Meadowlanes*, physically similar properties must be assessed at the same true cash value. However, petitioner misses the point that the *Meadowlanes* decision clearly authorized the treatment of the subsidized mortgage as a value-enhancing factor. *Id.* at 498. The Court ordered the Tax Tribunal to evaluate a variety of appraisal methods, but it left the Tax Tribunal with the duty to determine which method produced the most accurate valuation of

"the physical real estate and all the interests, benefits, and rights inherent in the ownership of the subject real property." *Id.* at 502. The comparison with physically similar properties was ordered so that the appraiser could adjust the price of the comparables, not the price of the subject property. *Id.* at 503. The Supreme Court emphasized that the taxpayer's appraiser "violated a basic principle under the comparable-sales approach by adjusting the value of the subject property rather than the sales price of a comparable property." *Id.* at 492.

The Supreme Court also stressed that the taxpayer's appraiser did not base his decision to exclude the value of the subsidy on market data, and it rejected the taxpayer's argument that market data would establish that the sales price of the property should be adjusted to "exclude consideration given for an atypical financing arrangement" because the interest subsidy under § 236 is not "atypical." *Id.* at 498. The financing was available to all § 236 projects, and the mortgage terms were transferable along with the property. *Id.* The Court found that the transferable § 236 tax credits would be considered by a hypothetical willing buyer in setting a sale price. *Id.* at 499. In sum, the Court ordered the Tax Tribunal to estimate the true cash value of the subject property based on all relevant factors, including, but not limited to, comparable properties and the value of the tax credits. Thus, *Meadowlanes* does not support petitioner's argument on appeal.

We hold that the uniformity requirement of the Michigan Constitution is not violated by the use of property tax appraisal methods that take into account the value of benefits accruing to owners of properties regulated under federal subsidized housing programs. *Antisdale, supra,* 420 Mich at 285; *Meadowlanes, supra,* 437 Mich at 498, 501-502. Under the aforementioned

cases, the Tax Tribunal correctly concluded that there is no legally cognizable distinction between low-income housing tax credits and these programs.

Petitioner has also failed to establish that the Tax Tribunal used an improper use-value approach to determine true cash value. Real property may not be assessed on the basis of the value of its use to the owner. *Safran, supra*, 88 Mich App at 382-383. "Use value" refers to the economic value of the use made by the property owner, regardless whether it is the highest and best use of the property. *Id.* In contrast, to determine true cash value, the property must be assessed at its highest and best use. *Great Lakes Div of Nat'l Steel Corp v City of Ecorse*, 227 Mich App 379, 408; 576 NW2d 667 (1998). Highest and best use "recognizes that the use to which a prospective buyer would put the property will influence the price which the buyer would be willing to pay." *Edward Rose Bldg Co v Independence Twp*, 436 Mich 620, 633; 462 NW2d 325 (1990). Here, petitioner does not dispute that the property is being put to its highest and best use as subsidized residential real estate. However, petitioner disputes that the tax credits have any value in determining the highest and best use.

The cases petitioner cited do not support its claim that the tax credits have only value-in-use to the owner of the building as opposed to value in exchange. For example, in *First Fed S&L Ass'n of Flint v City of Flint*, 415 Mich 702, 705-707; 329 NW2d 755 (1982), our Supreme Court found that the Tax Tribunal applied a wrong principle by including the value of physical renovations, such as the addition of fine wood and marble features, to the property value of a building used as a commercial bank. The appraisal method assumed that the improvements added to the true cash value of

the property on a dollar-to-dollar basis "without regard to whether they add to the selling price of the building." *Id.* at 706. The Court recognized that the renovations may have been more valuable to the bank in its current use than they would be to buyers on the relevant property market. *Id.* at 705-706. However, the Court did not hold, as petitioner represents in its brief on appeal, that the value of the renovations was an "irrelevant" or improper factor to include in the appraisal. Rather, the Court remanded the case to the Tax Tribunal for a proper determination of the extent to which those improvements enhanced the probable sale price of the property. *Id.* at 706-707.

Similarly, *Edward Rose Bldg, supra,* does not compel the conclusion that the manner in which property is held is irrelevant. Petitioner asserts that the Tax Tribunal violated this "rule" by considering, as part of the value of the subject property, the effect of plaintiff's ownership under the terms of IRC § 42. *Edward Rose Bldg, supra* at 624, arose from the valuation of a group of vacant, improved subdivision lots owned by the taxpayer, a housing developer. The Tax Tribunal used an appraisal method that discounted the true cash value of the lots on the assumption that the lots would be sold together at a wholesale price. *Id.* at 633. The method resulted in a significantly lower true cash value than the method used by the township, which assumed, on the basis of the developer's existing business, that the lots would be sold at individual retail lot prices. *Id.* at 626-627. However, it was undisputed that the property had been improved by the taxpayer and that the property's highest and best use was as single family residential lots. Therefore, our Supreme Court found that the wholesale discount was inappropriate. *Id.* at 633-635. Relying on the statutory definition of true cash value, the Court emphasized that valuation of property

must be based on actual facts rather than unduly speculative scenarios. *Id.* at 638. The actual facts of the taxpayer's business, as well as the recognized highest and best use of the property, indicated that the lots would be sold at the fair market value for individual, improved lots. *Id.* at 639. The Supreme Court cited with approval the opinion of this Court on the same matter:

> "Petitioner marketed only individual lots and only with a house petitioner built. On its own terms, the lots are unavailable for group-lot sales. The term "fair market value" presumes a market. Petitioner may not fairly argue that its property's value is comparable to other group-lot sales when petitioner specifically refuses to sell on that basis." [*Id.* at 639, quoting *Edward Rose Bldg Co v Independence Twp*, 164 Mich App 324, 329; 416 NW2d 433 (1987).]

The opinion in *Edward Rose Bldg* illustrates that a property owner will not be permitted to make a specious comparison between his or her property and a type of property with a more favorable tax treatment in order to obtain that more favorable treatment. The taxpayer in that case pointed to one trait of his property, the number of lots he held in the aggregate, in an attempt to obscure the importance of traits with more relevance to the fair market value of the property, e.g., its highest and best use and the segment of the market in which it would be sold. The Court recognized that it would violate the uniformity requirement of the Michigan Constitution to allow a large property owner this advantage over other property owners who were also selling individual lots. *Id.* at 641.

Here, petitioner points to the property's similarity to residential real estate and proposes that it must be valued at the same true cash value as identical, equally desirable apartment complexes that are not operated under IRC § 42. However, the property's highest and

best use is the most relevant factor for determining true cash value. Petitioner agreed that the highest and best use of the property is as a subsidized low-income housing project. Petitioner's contention that it may have to sell the property for a price comparable to property without a tax credit because property regulated under IRC § 42 is only desirable to certain buyers is equally speculative as the taxpayer's claim in *Edward Rose Bldg, supra* at 638, that it would have to sell the lots at wholesale because of soft demand for new homes. Though the low-income tax credits may not interest a "typical" buyer of residential rental property, there is a specialized market for properties subject to § 42 because, as stated in *Antisdale, supra,* 420 Mich at 285, "[t]he foremost value of these [subsidized] properties is found in the tax benefits they generate to the owner."

While there may be a question of fact regarding the approximate value the tax credits add to the selling price of the Huron Ridge property, which has a limited market appeal, adding value to the property on the basis of the credits does not violate the uniformity requirement of the Michigan Constitution. As we discuss further below, the majority of courts that have considered a similar issue have found that a willing buyer would undoubtedly consider the value of the tax credits in setting a price for low-income housing property because the credits are critical to the economic feasibility of the developments. See, e.g., *Rainbow Apartments v Illinois Prop Tax Appeal Bd,* 326 Ill App 3d 1105, 1108; 762 NE2d 534 (2001). Therefore, to the extent that the assessed true cash value of the property in issue differs from "otherwise identical" rental residential property, this difference reflects the different markets in which these properties are traded. We hold that the Tax Tribunal's method of valuation, specifi-

cally attributing value to the tax credits, does not violate the uniformity requirement of the Michigan Constitution.

### B. TAX CREDITS AS INTANGIBLES

Petitioner also raises an issue of first impression in this state: whether low-income housing tax credits are intangibles and whether they may be included in the valuation of real property for property tax assessment purposes. Ypsilanti Township accurately maintains that the majority of state courts that have considered the issue have concluded that the tax credits should be included when determining the value of a tax-credit-funded housing project. However, as petitioner noted below, the legislatures of many of those states quickly acted to overturn those court decisions.[2] Other states have passed legislation excluding the tax credits from the assessed value of real property on the basis of a general policy determination that higher taxation of the subject property reduces the tax credit's appeal to investors.[3]

Most states, including Michigan, exempt intangible property from taxation of real property by state constitution or by legislation. See Const 1963, art 9, § 3 (requiring Legislature to tax real and tangible property). Nonetheless, the courts of most of these states have held that the value of nontaxable intangible assets may be included in the assessment of real property or tangible business property if the intangibles "are deemed to be directly related to the tangible property, but not [where they] are deemed to be related to the business in which the tangible property is used." Anno:

---

[2] See, e.g., Georgia, OCGA 48-5-2(3)(B.1)(2003); Illinois, 35 ILCS 200/1-130(1999); and Pennsylvania, 72 PS § 5020-402(c)(2).

[3] See, e.g., New York — NY RPTL § 581-a (2005).

*Inclusion of intangible asset values in tangible property tax assessments*, 90 ALR5th 547, § 2(a), pp 562-563. Thus, the proper inquiry is whether the tax credits are intangible assets and, if so, whether they directly relate to the subject property.

The Illinois Court of Appeals held that "[IRC §] 42 tax credits are not intangible property because they do not constitute a right to a payment of money, have no independent value, and are not freely transferable upon receipt." *Rainbow Apartments, supra*, 326 Ill App 3d at 1108. Though, pursuant to IRC § 42, the tax credits are transferable to the project's equity investors, the Illinois court recognized that this transfer is not an actual sale. Rather, the credits remain within the limited partnership, and the investors "buy securities giving them an interest in the limited partnership." *Id.*

Likewise, a Georgia appellate court rejected the argument that low-income housing tax credits are intangible benefits associated with the ownership of real property. *Pine Pointe Housing LP v Lowndes Co Bd of Tax Assessors*, 254 Ga App 197, 200; 561 SE2d 860 (2002). The Georgia court found that the tax credits provide a "stream of value tied solely to the property," similar to anticipated rental income. *Id.*

Most recently, the Supreme Court of Idaho held that the right to claim low-income housing tax credits is not a contract right, which is a type of intangible personal property exempted by Idaho statute from consideration in the valuation of real property. *Brandon Bay Ltd Partnership v Payette Co*, 142 Idaho 681, 683, 684; 132 P3d 438 (2006). Instead, the court found that the tax credits are "rights and privileges" related to the property, which must be considered in the property's appraisal because fair market value must reflect all benefits flowing from the property. Federal low-income

housing tax credits were part of the stream of benefits that flowed from the property, and were equivalent to income. *Id.* at 684. The court reasoned that the credits cannot be separated from an ownership right in the low-income housing. Any subsequent owner of the property "steps into the shoes" of the seller in terms of receiving the credits on the conditions set forth in the regulatory agreement and risks recapture of the credits already awarded. *Id.*[4]

Petitioner relies on four cases in which courts held that the tax credits are intangible personal property and, therefore, should be excluded from property tax appraisals. See *Bayridge Assoc LP v Dep't of Revenue*, 321 Or 21, 31-32; 892 P2d 1002 (1995); *Cascade Court LP v Noble*, 105 Wash App 563; 20 P3d 997 (2001); *Maryville Properties, LP v Nelson*, 83 SW3d 608, 616 (Mo App, 2002); *Cottonwood Affordable Housing v Yavapai Co*, 205 Ariz 427; 72 P3d 357 (2003). We are not persuaded that these cases support petitioner's position.

The Oregon Supreme Court addressed this issue only in passing because the case turned on the narrow issue whether participation in the IRC § 42 program amounted to a government restriction on the use of property. *Bayridge, supra,* 321 Or at 27-28. After deciding that issue, the court swiftly dismissed the government's argument that the tax credits should be factored into the value of the low-income housing property, and the court failed to address the transferability of the credits. *Id.* at 31-32. The court accepted the reasoning

---

[4] We further note that two courts that have decided to include the value of the tax credits in property valuation are in states with no constitutional or statutory exemption for intangible personal property for property tax purposes. *Spring Hill, LP v Tennessee State Bd of Equalization,* unreported decision of Tennessee Court of Appeals, issued December 31, 2003 (Docket No. M2001-02683-COA-R3-CV); *Town Square LP v Clay Co Bd of Equalization,* 704 NW2d 896 (SD, 2005).

of the tax court that " '[i]f tax benefits are limited to the first owner or are recaptured when a property is transferred, such benefits will not enter into market considerations.' " *Id.* at 31. Likewise, the Washington decision only very briefly addressed the tax credits, and the court did not provide any substantive analysis of the issue. See *Cascade, supra,* 105 Wash App at 571.

The Missouri Court of Appeals considered the valuation of the tax credits in greater depth. The court reasoned that low-income housing tax credits are not characteristics of the property like zoning or location, which inherently transfer with the property and, therefore, directly affect the selling price. *Maryville, supra,* 83 SW3d at 616. Though it acknowledged that the tax credits transfer to subsequent owners during the ten-year period and that they "appear to add value to a property," the court asserted that "the literature dealing with these projects suggests that most prudent investors will stay in the project for fifteen years." *Id.* The court reasoned that potential buyers of the property would "be looking for a discount from face value of the unused tax credits," and thus, the seller's rate of return, based on the ten-year value of the tax credits, would be "sharply reduced if he sells the property before receiving the full value of the tax credits." *Id.* On the basis of this empirical finding, the court ruled that the tax credits are intangible assets that "make no direct contribution to the market value of these housing projects." *Id.* at 617.

The Arizona Tax Court later examined the *Cascade* and *Maryville* decisions. *Cottonwood, supra,* 205 Ariz at 429-431. It concluded that low-income housing tax credits were properly categorized as intangible interests in a partnership. *Id.* at 429. The court accepted the reasoning of the Missouri Court of Appeals in *Maryville* that the value of the tax credits is to the owner of the

partnership interest and not to the property itself. *Id.* Though the court recognized that the partnership interests were transferable, it reasoned that "[t]he tax credits will not significantly affect the marketability of the project, particularly if the property were to be resold at or near its tenth year of operation, because at that time the credits will have been exhausted . . . ." *Id.* The court did not entertain the possibility of a sale of the property in the early years of its operation.

None of the four decisions supports petitioner's argument in favor of valuing the property on the basis of market rents for comparable residential rental real estate. Moreover, two of the four opinions do not contain any actual analysis of the issue before this Court, and the two opinions that do offer analysis, *Maryville* and *Cottonwood*, err in overlooking or underestimating the value of the credits during the ten-year payout period. For example, the *Maryville* court reached a conclusion that was inconsistent with its own analysis. The court acknowledged the existence of a market for low-income housing tax credit property during the ten-year period in which the credits are available. In fact, the court noted that the value of the remaining credits would fuel competition for such properties in light of the fact that the credits are more valuable to investors in higher tax brackets. *Maryville, supra,* 83 SW3d at 615 and n 2. Nevertheless, the court ruled that the tax credits do not contribute to the fair market value of the property because a prudent owner of tax-credit property would not sell at the fair market value during the ten-year period. *Id.* at 616-617.

Fair market value is the amount at which a willing buyer and a willing seller would arrive in an open and competitive market. The Missouri court essentially denied the existence of a willing seller for low-income

housing tax credit property during the relevant period and, therefore, subjectively concluded that the tax credits were no factor in the fair market value. Similarly, the Arizona court overlooked the possibility of an appraisal method, like the one at issue here, that would include the value of the remaining tax credits in the property's assessed value, during the ten-year payout period, in a manner that reflects their diminishing value. See *Cottonwood, supra,* 205 Ariz at 429. Instead, the Arizona court determined that, because the credits expire after the tenth year of operation, they do not influence the fair market value for the property. *Id.*

Here, the property is within the first ten years of its operation under IRC § 42. Petitioner will receive annual tax credits through 2011 if it continues to own the property and complies with the terms of the regulatory agreement. Therefore, we must consider the effect of the tax credits on the property's true cash value during the years in question. Accordingly, we hold that the Tax Tribunal correctly determined that the *Cottonwood, Marysville, Cascade,* and *Bayridge* decisions are contrary to Michigan caselaw.

*Antisdale, supra,* 420 Mich at 285 (tax benefits should be reflected in the valuation to the extent they increase or decrease value of real property), and *Meadowlanes, supra,* 437 Mich at 498 (value of a subsidized mortgage must be reflected in tax assessment), among other Michigan cases, establish that Michigan's approach to the valuation of nontaxable intangible assets is comparable to the states that characterize the tax credits as intangibles that directly affect the value of the property.[5]

---

[5] Generally, courts also regard the rental restrictions under IRC § 42 as a negative factor in the valuation that goes hand in hand with the tax credits. See, e.g., *Cottonwood, supra,* 205 Ariz at 430-431. While the

In Michigan, intangibles are not taxable in and of themselves, but they may be taken into account for purposes of assessing the value of tangible property under the General Property Tax Act and other statutes. See *Michigan Bell, supra,* 445 Mich at 481; *Sweepster, Inc v Scio Twp,* 225 Mich App 497, 501-502; 571 NW2d 553 (1997). Our Supreme Court applied this general rule to the specific context of federally subsidized housing projects in both *Antisdale* and *Meadowlanes.* The Court has noted that "[t]he basic principles of valuation apply to the assessment of value of federally subsidized housing complexes in the same manner as they apply to all other real property." *Meadowlanes, supra,* 437 Mich at 483.

As discussed, in *Antisdale,* the federal subsidy was a favorable mortgage loan from the FmHA for a low-income apartment complex. *Antisdale, supra,* 420 Mich at 268-269. The mortgage carried an interest rate on its face of over 7 percent but the FmHA waived interest payments to the extent that they exceeded one percent. *Antisdale, supra,* 109 Mich App at 630. Market data revealed that FmHA projects were generally sold at approximately 10 to 15 percent over the outstanding mortgage balance in sales structured as land contracts, with the purchaser assuming the favorable mortgage loan. *Id.* at 631-632. Therefore, a purchaser in a high income tax bracket could reduce its federal income tax liability by acquiring the property. *Id.* at 637 (BRONSON, J., dissenting). This Court noted that "the chief value of [the] property in the marketplace is as a tax shelter and the price that a buyer is willing to pay at a private sale

value of rent restrictions is not at issue in this appeal, we note that, in Michigan, using hypothetical rental rates is not an appropriate method of valuation for federally subsidized housing developments. See *Antisdale, supra,* 109 Mich App at 633; *Congresshills Apartments v Ypsilanti Twp,* 102 Mich App 668, 676-677; 302 NW2d 274 (1981).

is determined by that aspect of the property . . . ." *Id.* at 633-634. Indeed, this Court noted that there would not be a private market for FmHA funded low-income housing were it not for the tax-shelter aspect of the property. *Id.* Our Supreme Court agreed that the subsidy increased the value of the property. *Antisdale, supra,* 420 Mich at 283. The Court noted that, "without the subsidy, debt service would be so high, there would be substantial negative cash flow which could reduce the tax shelter benefit to a point where the shelter was no longer an incentive to purchase." *Id.* at 284 (quotation and citation omitted). The Court recognized that the tax benefits were nontaxable intangible property but found that, as value-influencing intangibles, they should be included within the true cash value of the property. *Id.* at 285.

In *Meadowlanes,* the federal subsidy was an interest-rate reduction provided to the owners of a low-income housing complex pursuant to § 236 of the National Housing Act. *Meadowlanes, supra,* 437 Mich at 477. Citing *Antisdale,* our Supreme Court ruled that the federal subsidy must be considered in the same manner as value-influencing intangibles such as tax benefits, location, and zoning. *Id.* at 496. The Court found that the interest-rate reduction enhanced the value of the property by increasing the income-earning capacity of the building and reducing the property's operating costs. *Id.* Because § 236 subsidies are transferable to purchasers of the regulated property, the Court found that a willing buyer and a willing seller would consider their value in a private sale. *Id.* at 499. The Court also recognized that the negative aspects of the regulatory agreement, such as restricted rents and restricted tenant eligibility, should also be a factor in the appraisal method. *Id.* at 499-500.

We conclude that the tax treatment of the IRC § 42 subsidies at issue here is governed by *Antisdale* and *Meadowlanes*. The purpose of the IRC § 42 program is to stimulate demand for ownership interests in low-income housing projects by attaching a valuable tax credit to that interest. Just as this Court described in *Antisdale,* there would be no market for private investment in low-income housing development were it not for these federal tax incentives. *Antisdale, supra,* 109 Mich App at 633-634. Petitioner's apartment complex, and other developments under IRC § 42, would not be financially feasible without the financing predicated on the assignment of the tax credits to private investors. Therefore, the fair market value of IRC § 42 subsidized housing is not merely influenced by, but is primarily driven by, the tax credits. For that reason, we also agree with those states that have found that the appraised value of the property for property tax purposes would be artificially depressed if the value of the tax credits is not included. See *Pine Pointe Housing, supra,* 254 Ga App at 200.

Certainly there are public policy arguments in favor of excluding the value of the tax credits from the property tax assessments of low-income housing projects operated under IRC § 42. Some state legislatures have acted to shield low-income housing tax credit property from higher state property taxation out of concern that higher taxation will impede the development of much needed low-income housing. The Michigan Legislature is the proper institution in which to make such public policy determinations, not the courts. Additionally, we note that, in *Meadowlanes*, our Supreme Court rejected a similar public policy contention because "there is no indication [that] Congress intended to create subsidies by local units of government in addition to the significant economic incentives it

provided to induce private developers to construct and operate quality low-income housing." *Meadowlanes*, *supra*, 437 Mich at 500.[6]

Because petitioner failed to establish that the Tax Tribunal made an error of law or applied a wrong principle in calculating the true cash value of the property, the decision of the Tax Tribunal is affirmed.

Affirmed.

---

[6] Likewise, IRC § 42 does not address the issue of property tax assessment of these properties.