# STATE OF MICHIGAN

# COURT OF APPEALS

---

HARTLAND GLEN DEVELOPMENT, LLC,

        Petitioner-Appellant,

v

TOWNSHIP OF HARTLAND,

        Respondent-Appellee.

UNPUBLISHED
February 19, 2015

No. 318843
Tax Tribunal
LC No. 00-416369

---

Before: MURPHY, P.J., and METER and SERVITTO, JJ.

PER CURIAM.

Petitioner appeals as of right the opinion and judgment issued by the Michigan Tax Tribunal (MTT) regarding property tax assessments levied by respondent Hartland Township (the township) on petitioner's golf course for tax years 2011 and 2012. The crux of this appeal concerns the MTT's ruling that special assessments encumbering the property and payable in installments, some of which were past due with the remaining due in the future, did not result in a decrease in the property's true cash value (TCV). The MTT essentially found this proposition to be true in all tax cases involving property subject to outstanding special assessments. We reverse and remand for further proceedings consistent with this opinion.

The subject property in this case is a 36-hole golf course located in the township, which property comprises 383.58 acres and includes a clubhouse, pro shop, restaurant-bar, offices, and miscellaneous outbuildings. The township assessed the property at a TCV of $2,980,000 for tax year 2011, with a taxable value (TV) of $1,490,000. The township assessed the property at a TCV of $2,741,600 for tax year 2012, with a TV of $1,370,800. Petitioner appealed the township's tax assessments to the MTT with respect to both tax years. Petitioner argued that the TCV of the property for 2011 should have been $555,000, with a TV of $277,500, and that the TCV and TV for 2012 should have been zero. The enormous difference between the assessed amounts and those argued by petitioner was primarily the result of petitioner's claim, supported by its appraiser, that amounts due in special assessments should be deducted from value in the process of calculating the TCV.

With respect to the specific nature of the special assessments that encumbered the property, the MTT recited the following facts:

    A $792,000 Special Assessment was levied in 2005 for 144 Residential Equivalent Units ("REUs") for residential unit sewer taps. The annual payments

-1-

were $71,000. In 2011, the Township corrected the Special Assessment and levied $2,364,596.85 for 603.14 REUs (Resolution 11-R032). Respondent also levied a Supplemental Special Assessment of $199,488.76 (Resolution 11-R034) in 2011.[1]

The appraiser hired by the township as its expert provided a bit more detail in his appraisal regarding the special assessments, observing:

A significant portion of the outstanding real property taxes due are associated with a special assessment for sewer that began in 2005. The special assessment district originally allocated the REUs to the various ownership groups in the district, which were then divided equally across the various tax parcels each group owned. However, in 2011 the REUs were reallocated across the various tax parcels based on acreage, along with creating an additional supplemental assessment district to assess additional costs incurred by the district. The original district assigned 144 REUs to the subject parcel, which was part of a larger group of parcels then controlled by the subject owner. The original special assessment had a principal cost of $792,000 that was spread across a 20-year declining balance payment schedule at 5.25% interest. However, in 2011 the REUs were reallocated with 603.14 REUs assigned to the subject parcel, resulting in a principle amount of $2,364,596.85 being outstanding.[2] In addition, a supplemental special assessment for additional costs in the principle amount of $199,448.70 was also created, which was spread across a 15-year declining balance payment schedule at 5.50% interest.

Petitioner failed to make the annual installment payments regarding the special assessments by the time of the tax dispute, and petitioner is currently in default. There are of course more scheduled "special assessment" installment payments due in the future.

In the MTT, the township's appraiser opined that the property had a TCV of $3,260,000 for tax year 2011, with a TV of $1,630,000, and that the property had a TCV of $2,880,000 for tax year 2012, with a TV of $1,440,000. In his appraisal, he indicated that "the client [township] has requested the appraiser[] to estimate the market value of the subject property under the hypothetical condition the special assessment has been paid on the ownership as of each effective date of value, with no outstanding balance due/payable." The township's appraiser testified at the MTT hearing consistently with these comments, noting that he employed the hypothetical of the special assessments being fully paid in valuing the property. The township's appraiser further testified upon questioning by petitioner's counsel:

---

[1] Petitioner and the township entered into a contract regarding the original 2005 special assessment for 144 REUs, but petitioner did not agree with the 2011 corrected and supplemental special assessments, which led to litigation, with an appeal currently pending in this Court in *Hartland Glen Dev, LLC v Hartland Twp*, Docket No. 321347.

[2] According to the associated township resolution, the $2,364,596 was to be paid in 14 annual installments at an interest rate of 5.5 percent per annum.

*Q.* So you cannot say that the value of the property would be less if you had not assumed that $2.6 million, approximately, of special assessment[s] had just been paid?

*A.* Well, I – if the buyer assumed the responsibility of the payment of it, in all likelihood it would be less. But for me to say that, I need to do an appraisal. I'm not allowed to give an opinion or direction of value without completing an appraisal.

*Q.* Okay. Did I hear you say it would be less?

*A.* In all likelihood, it would be less –

*Q.* Okay.

*A.* – but I cannot say without doing the research.

With respect to petitioner's appraiser, when asked what the difference was between the outstanding special assessments and a situation involving an outstanding mortgage, which both parties seem to agree is not to be considered in valuing a property, the appraiser testified:

When an individual has a mortgage on a property and they sell the property, the mortgage is typically paid off from the proceeds of sale. In this instance, it was implied that the payment for this indebtedness . . . is going to go on for a 14-,15-, or 20-year period.

. . .

[The] difference is a mortgage is guaranteed by an individual. In this case, the outstanding balance for the special assessment is effectively a lien on the real estate.

When petitioner's appraiser was given a hypothetical in which a property owner obtained a loan from a bank secured by a mortgage on the property in order to fully pay off an outstanding special assessment, the appraiser stated that the mortgage would not be considered in valuing the property. Given this response, the township's counsel then asked the appraiser, "So, again, what's the difference?" The appraiser responded, "I guess I can't give you an answer, Counselor."

The dispute involves the impact, if any, of unpaid special assessments on a property's TCV. The MTT ruled as follows on the issue:

In this instance, [petitioner's expert's] use of . . . a mortgage appraisal technique . . . to determine the true cash value of the subject property is improper. The deduction of the unpaid Special Assessment balance is akin to deducting an outstanding mortgage balance. It may be a function of a lending institution to follow federal regulatory agencies to provide for lending capital and determine a party's equity position, but it is not appropriate for determining true cash value under MCL 211.27.

-3-

. . .

[This] Tribunal is not to determine if a party can qualify for mortgage purposes. The Tribunal is also not considering the validity of the Special Assessment. The Tribunal is charged with determining the true cash value of the subject property.

. . .

Valuing the subject property's equity interest is not [a] fee simple interest. The fee simple interest does not include a deduction of the unpaid balance of a special assessment. The Special Assessment was considered an encumbrance pursuant to Petitioner's appraisal. Therefore, Petitioner's resulting value indication is not considered an "unencumbered" fee simple interest.

. . .

[The MTT is now speaking of a different property used by both appraisers in applying the sales-comparison approach to valuation, and which was also subject to the special assessment.] [The township's expert] included the outstanding balance of the Special Assessment as part of the sale price. . . . [He] clarified his addition of the outstanding balance of the Special Assessment to the sale price, "Because the purchaser had to assume the responsibility of paying it." . . . Special assessments run with the land, not the owner. The Tribunal finds that this is akin to expenditures immediately after purchase. The inclusion of the balance makes sense and is an appropriate appraisal methodology when determining the true cash value of the subject property, which contains the same Special Assessment and outstanding balance thereof.[3]

The MTT ruled that the TCV of the property for tax year 2011 was $2,700,000, with a TV of $1,350,000, and that the TCV for tax year 2012 was $2,400,000, with a TV of $1,200,000. Petitioner appeals as of right.

---

[3] In another MTT opinion and judgment, cited by the township and issued around the same time as that issued here, the MTT used almost identical language to that used in this final paragraph, except that the following language and explanation were also provided:

The adjustment for expenditures immediately after purchase . . . would thus be the anticipated expenditure – the balance of the special assessment added to the purchase price to arrive at value with the reasoning that when the parties negotiated the transaction, they deducted this cost from the price they otherwise would have arrived at if the property had this amenity [water and sewer service.] [*Hartland M59 Investments, LLC v Hartland Twp*, issued October 15, 2013 (MTT Docket No. 415661), at 10.]

The MTT "has exclusive and original jurisdiction over . . . [a] proceeding for direct review of a final decision . . . relating to [an] assessment [or] valuation . . . under the property tax laws of this state." MCL 205.731(a). An appeal of an MTT decision is by right to this Court. MCL 205.753(1); MCR 7.203(A)(2). With respect to our standard of review, the Michigan Supreme Court in *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 527-528; 817 NW2d 548 (2012), observed:

> Review of decisions by the Tax Tribunal is limited. In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. The Tax Tribunal's factual findings are final if they are supported by competent, material, and substantial evidence on the whole record. If the facts are not disputed and fraud is not alleged, our review is limited to whether the Tax Tribunal made an error of law or adopted a wrong principle. [Quotation marks and citations omitted.]

The interpretation and application of tax statutes are legal issues subject to de novo review. *Danse Corp v City of Madison Hts*, 466 Mich 175, 178; 644 NW2d 721 (2002).

The taxing authority of the state emanates from the Michigan Constitution, which provides in relevant part:

> The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law except for taxes levied for school operating purposes. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. [Const 1963, art 9, § 3.]

MCL 211.27(1) defines "true cash value" as referenced in Const 1963, art 9, § 3, providing as follows:

> "[T]rue cash value" means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale. . . . In determining the true cash value, the assessor shall also consider the advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures, including farm structures; present economic income of land if the land is being farmed or otherwise put to income producing use; quantity and value of standing timber; water power and privileges; minerals, quarries, or other valuable deposits not otherwise exempt under this act known to be available in the land and their value.

"True cash value is synonymous with fair market value." *Great Lakes Div of Nat'l Steel Corp v City of Ecorse*, 227 Mich App 379, 389; 576 NW2d 667 (1998). Accordingly, an "assessment must reflect the probable price that a willing buyer and a willing seller would arrive

at through arm's length negotiation." *Huron Ridge LP v Ypsilanti Twp*, 275 Mich App 23, 28; 737 NW2d 187 (2007). "The Tax Tribunal is under a duty to apply its expertise to the facts of a case in order to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances." *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 389. The goal, ultimately, is for the MTT to employ a valuation process that leads to a well-supported conclusion reflecting the study of all factors influencing market value, which process can entail reasonable approximations and a considerable amount of judgment, absent the need to quantify every possible value factor. *Id.* at 398-399. "Regardless of the valuation approach employed, the final value determination must represent the usual price for which the subject property would sell," and an appraiser must analyze "data mathematically to determine an estimate of the fair-market value of both the physical real estate and all the interests, benefits, and rights inherent in ownership of that real property." *Meadowlanes Ltd Dividend Housing Ass'n v Holland*, 437 Mich 473, 485; 473 NW2d 636 (1991) (citation omitted).

Consistent with these authorities, the determination of TCV needed to entail contemplation of a hypothetical sale of the golf course and the likely selling price or TCV on the tax assessment dates of December 31, 2010 and 2011. In that context, the question that is posed is whether the existence of the outstanding special assessments could decrease the TCV. We begin with an overview of the law of special assessments.

With respect to special assessments in general, this Court in *Niles Twp v Berrien Co Bd of Comm'rs*, 261 Mich App 308, 323-324; 683 NW2d 148 (2004), explained:

> Although it resembles a tax, a special assessment is not a tax. While the purpose of a tax is to raise revenue for general governmental purposes, the purpose of a special assessment is to defray the costs of specific local improvements. The differences between a special assessment and a tax are that (1) a special assessment can be levied only on land; (2) a special assessment cannot be made a personal liability of the person assessed; (3) a special assessment is based wholly on benefits; and (4) a special assessment is exceptional both as to time and locality. Also, in general, the amount of the special assessment must bear a reasonably proportionate relationship to the benefit accruing to the property assessed. [Citations, quotation marks, and ellipsis omitted.]

Townships have the statutory authority to make improvements, such as the construction of sewers, MCL 41.722(1)(a), and "to determine that the whole or any part of the cost of an improvement shall be defrayed by special assessments against the property especially benefited by the improvement," MCL 41.721. If a township board desires to proceed with a particular improvement, the board must "tentatively declare by resolution its intention to make the improvement and tentatively designate the special assessment district against which the cost of the improvement or a designated part of the improvement is to be assessed." MCL 41.724(1). Following required filings, notices, hearings, and the confirmation and endorsement of an assessment roll, MCL 41.723 to MCL 41.726, a special assessment is finalized, and a township may allow assessed property owners to pay in annual installments under MCL 41.727. MCL 41.727(4) provides:

If an installment of a special assessment is not paid when due, then the installment shall be considered to be delinquent and there shall be collected, in addition to interest as provided by this section, a penalty at the rate of not more than 1% for each month, or fraction of a month, that the installment remains unpaid before being reported to the township board for reassessment upon the township tax roll.

"All special assessments contained in any special assessment roll, including any part thereof deferred as to payment, shall from the date of confirmation of such roll, constitute a lien upon the respective parcels of land assessed." MCL 41.728. A special assessment lien is considered to have the same character and effect as a lien created for township taxes, including accrued interest and penalties. *Id.*

The MTT equated an outstanding special assessment to an outstanding mortgage, concluding that there should be no deduction from TCV for either, as the MTT was not concerned with a property's equity value but rather the property's fee simple TCV. As reflected above, a township special assessment is levied on particular real property to cover the costs of an improvement project that must benefit that real property, with the requirement that the amount of the assessment be reasonably proportionate to the benefit, resulting in a tax-like lien being held by the township on the property. On the other hand, with respect to a mortgage, it "is not an estate in land; it is a lien on real property intended to secure performance or payment of an obligation." *Prime Fin Servs v Vinton*, 279 Mich App 245, 256; 761 NW2d 694 (2012). These are distinct real property concepts, yet there are some commonalities. An analogy can be made between a special assessment and a mortgage transaction that specifically funds a home improvement project; both result in a lien against the property, both will likely benefit the property, and both can potentially be paid off by way of future installment payments. But of course, many mortgages are just the result of obtaining a loan to acquire property in the first place, absent any connection to an improvement, while special assessments must be tied to an improvement and be reasonably proportionate to the benefit accruing to the assessed property. Petitioner's appraiser differentiated a mortgage from a special assessment on the basis that a mortgage "is guaranteed by an individual" and "is typically paid off from the proceeds of sale." However, a township special assessment, while not creating personal liability for a property owner, must be paid by the owner under threat of foreclosure of the lien, and the record never made clear regarding whether delinquent special-assessment payments, and possibly the entire assessment, would have to be paid off at a closing on the property.[4]

---

[4] At oral argument, counsel for the township stated that townships vary with respect to whether they demand the payoff of a special-assessment lien at the time a property subject to such a lien is conveyed, suggesting that it is a discretionary call. We surmise that a purchaser's mortgagee would demand the payment of any delinquent special-assessment installments at a closing, if not the whole special assessment, or at least demand to subrogate to the lien priority position of the township in light of the township's special-assessment lien, which is treated like a township tax lien, MCL 41.728.

The bottom line here is that petitioner's appraiser opined that the outstanding special assessments decreased the golf course's TCV and the township's appraiser indicated that, if a purchaser had to make future special-assessment payments, it would likely decrease the property's TCV. Therefore, there was no evidence supporting the MTT's ruling that the outstanding special assessments would not decrease the TCV. The MTT treated the issue as a purely legal question, but the testimony of the township's appraiser suggested that it is a factual question, at least in part, where he testified that a decrease in TCV would likely result if a purchaser had to assume an outstanding special assessment, but a new appraisal would have to be undertaken to make a definitive determination.

As quoted earlier in this opinion, when speaking in regard to a property used by the appraisers in the sales-comparison approach to valuation, the MTT indicated that an outstanding special assessment should be added to the sales price in calculating TCV. At oral argument, counsel for the township, when presented with a hypothetical of a property with a starting value of $200,000 and an assumable, outstanding $100,000 special assessment, argued that the TCV would be around $300,000, given that the special-assessment amount would have to be reasonably proportionate to an increase in the property's value as caused by the improvement. This begs two questions. First, under the hypothetical, it would seem that the "selling price" would be $200,000, given the purchaser's assumption of the $100,000 outstanding special assessment, and how can a $300,000 TCV be reconciled with MCL 211.27(1)'s dictate that TCV "means the usual *selling price . . .* at the time of assessment." (Emphasis added.)[5] Second, what is the result if, contrary to law, the special assessment is *not* reasonably proportionate to the supposed benefit accruing to the property, which petitioner vigorously argues is the situation in this case. Returning to our hypothetical ($200,000 starting value and $100,000 outstanding special assessment), if no value were added to the property because of a construction project, a willing purchaser would likely offer only $100,000 for the property, given that he or she would have to pay an additional $100,000 in the future absent any added value to the property resulting from the project. It would seem that if a special assessment were unchallenged or ultimately found to be valid under the law, the township's position might be sound, but even then the problem is the testimony of its expert that suggested otherwise.[6]

In light of the pending appeal challenging the special assessments in Docket No. 321347, the lack of any relevant elaboration by the township's appraiser that the TCV would likely be decreased if the outstanding special assessments were assumed by a purchaser, subject to the

---

[5] We are not holding that they cannot be reconciled, but only that the existing record and arguments inadequately address the issue, which is to be explored on remand.

[6] The separate litigation pending before this Court challenging the special assessments will ultimately result in a special assessment that is in compliance with law (or the elimination of the corrected and supplemental special assessments). This might suggest that we should simply affirm; however, absent this Court completely nullifying the challenged special assessments, there would still remain the question whether an outstanding special assessment that is to be assumed by a purchaser can result in a decrease in TCV, which the township's appraiser stated would be the likely result.

appraiser doing a new appraisal, and the questions raised by us in this opinion, we conclude that remand for further proceedings is the proper course of action.

To provide clarity on remand, we provide the following directives. First, because the focus of the dispute concerns the special assessments and because the related appeal challenges those assessments, remand proceedings here shall await final resolution of that appeal. Thereafter, and as framed by and depending on the result of the other appeal, proceedings are to be conducted to fully explore the question whether outstanding special assessments can and did decrease the property's TCV. The proceedings should entail arguments, testimony, and evidence on the issues and questions raised and highlighted in this opinion, including clarification and elaboration with respect to the township's appraiser's testimony cited in this opinion and possibly the preparation of new appraisals.

Finally, petitioner also argues that the MTT committed error in admitting the township's "last-minute" supplemental 330-page valuation and in admitting the testimony of the township's appraiser who had prepared that valuation. We conclude that the MTT did not abuse its discretion in admitting the evidence and, even if it did abuse its discretion, the assumed error was harmless, as petitioner has not established the requisite prejudice, especially given the nature of the primary dispute. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999) (abuse of discretion standard is applicable to evidentiary rulings); MCR 2.613(A) (harmless-error rule). Furthermore, we see no reason to reverse on this issue in light of our holding remanding the case for further proceedings.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction. We decline to award taxable costs under MCR 7.219.

/s/ William B. Murphy
/s/ Patrick M. Meter
/s/ Deborah A. Servitto