# STATE OF MICHIGAN

# COURT OF APPEALS

LARS ASSOCIATES, L.L.C.,

UNPUBLISHED
January 27, 2015

Petitioner-Appellant,

v

No. 318141
Tax Tribunal

CITY OF CHELSEA,

LC No. 00-414127

Respondent-Appellee.

Before: MURPHY, P.J., and METER and SERVITTO, JJ.

PER CURIAM.

Petitioner Lars Associates, L.L.C., appeals as of right an opinion and judgment issued by the Michigan Tax Tribunal (MTT) that valued the Chelsea Shopping Center at a taxable value (TV) of $1,482,875 in 2011 and at a TV of $1,509,700 in 2012. We reverse and remand to the MTT.

## I. OVERVIEW

For both tax years 2011 and 2012, respondent City of Chelsea (the city) assessed the shopping center at a TV of $2,167,400. At the hearing before the MTT, the city argued that, on the basis of the testimony of its appraiser, the TVs for 2011 and 2012 should actually be increased by approximately $200,000. Petitioner's appraiser opined at the hearing that the TVs for both 2011 and 2012 should be $1,030,000. The MTT ruled as indicated above, and petitioner, while generally pleased with the MTT's analysis, finds fault with three components of the MTT's computations relative to determining true cash value.

## II. STANDARDS OF REVIEW AND APPLICABLE LEGAL PRINCIPLES

The MTT "has exclusive and original jurisdiction over . . . [a] proceeding for direct review of a final decision . . . relating to [an] assessment [or] valuation . . . under the property tax laws of this state." MCL 205.731(a). An appeal of an MTT decision is by right to this Court. MCL 205.753(1); MCR 7.203(A)(2). With respect to our standard of review, the Michigan Supreme Court in *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 527-528; 817 NW2d 548 (2012), observed:

> Review of decisions by the Tax Tribunal is limited. In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to

-1-

any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. The Tax Tribunal's factual findings are final if they are supported by competent, material, and substantial evidence on the whole record. If the facts are not disputed and fraud is not alleged, our review is limited to whether the Tax Tribunal made an error of law or adopted a wrong principle. [Quotation marks and citations omitted.]

"[A] Tax Tribunal decision that is not supported by competent, material, and substantial evidence on the whole record is an 'error of law.'" *Great Lakes Div of Nat'l Steel Corp v City of Ecorse*, 227 Mich App 379, 388; 576 NW2d 667 (1998). "[W]e . . . defer to the MTT to assess the weight and credibility of the evidence before it." *Drew v Cass Co*, 299 Mich App 495, 502; 830 NW2d 832 (2013). We may not set aside the MTT's factual findings that are sufficiently supported by the evidence on the basis that alternative findings are also supported by the evidence or because we would have reached a different result. *Id.* at 501. The interpretation and application of tax statutes are legal issues subject to de novo review. *Danse Corp v City of Madison Hts*, 466 Mich 175, 178; 644 NW2d 721 (2002).

The taxing authority of the state emanates from the Michigan Constitution, which provides in relevant part:

> The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law except for taxes levied for school operating purposes. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. [Const 1963, art 9, § 3.]

"[A]ll property, real and personal, within the jurisdiction of this state, not expressly exempted, shall be subject to taxation." MCL 211.1. "For the purpose of taxation, real property includes . . . [a]ll land within this state, all buildings and fixtures on the land, and all appurtenances to the land . . . ." MCL 211.2(1)(a). Additionally, MCL 211.27a(1) provides that, generally, "property shall be assessed at 50% of its true cash value" under Const 1963, art 9, § 3. MCL 211.27(1) addresses the meaning of "true cash value," providing as follows:

> "[T]rue cash value" means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale. . . . In determining the true cash value, the assessor shall also consider the advantages and disadvantages of location; quality of soil; zoning; existing use; present economic income of structures, including farm structures; present economic income of land if the land is being farmed or otherwise put to income producing use; quantity and value of standing timber; water power and privileges; minerals, quarries, or other valuable deposits not otherwise exempt under this act known to be available in the land and their value.

"True cash value is synonymous with fair market value." *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 389. Accordingly, an "assessment must reflect the probable price that a willing buyer and a willing seller would arrive at through arm's length negotiation." *Huron Ridge LP v Ypsilanti Twp*, 275 Mich App 23, 28; 737 NW2d 187 (2007). While a petitioner has the burden to establish a property's true cash value, the MTT has the obligation "to make an independent determination of true cash value." *President Inn Props, LLC v Grand Rapids*, 291 Mich App 625, 631; 806 NW2d 342 (2011). "Thus, even when a petitioner fails to prove by the greater weight of the evidence that the challenged assessment is wrong, the Tax Tribunal may not automatically accept the valuation on the tax rolls." *Id.*

"The Tax Tribunal is under a duty to apply its expertise to the facts of a case in order to determine the appropriate method of arriving at the true cash value of property, utilizing an approach that provides the most accurate valuation under the circumstances." *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 389. The goal, ultimately, is for the MTT to employ a valuation process that leads to a well-supported conclusion reflecting the study of all factors influencing market value, which process can entail reasonable approximations and a considerable amount of judgment, absent the need to quantify every possible value factor. *Id.* at 398-399.

With respect to particular methods of valuation, our Supreme Court in *Meadowlanes Ltd Dividend Housing Ass'n v Holland*, 437 Mich 473, 484-485; 473 NW2d 636 (1991), stated:

> There are three traditional methods of determining true cash value, or fair-market value, which have been found acceptable and reliable by the Tax Tribunal and the courts. They are: (1) the cost-less-depreciation approach, (2) the sales-comparison or market approach, and (3) the capitalization-of-income approach. Variations of these approaches and entirely new methods may be useful if found to be accurate and reasonably related to the fair-market value of the subject property. . . . Regardless of the valuation approach employed, the final value determination must represent the usual price for which the subject property would sell.
>
> Under each approach, the appraiser analyzes data mathematically to determine an estimate of the fair-market value of both the physical real estate and all the interests, benefits, and rights inherent in ownership of that real property. [Citations and footnotes omitted.]

In this case, the MTT used the capitalization-of-income approach to calculate the shopping center's true cash value.[1] "The income-capitalization approach measures the present value of the future benefits of property ownership by estimating the property's income stream

---

[1] The parties' experts both employed a capitalization-of-income approach backed up with a sales-comparison or market approach. The MTT decided to solely utilize the capitalization-of-income approach, given that the appraisers primarily relied on said approach and because the MTT found that neither appraiser adequately and credibly supported their conclusions using the sales-comparison approach.

and its resale value (reversionary interests) and then developing a capitalization rate which is used to convert the estimated future benefits into a present lump-sum value." *Id*. at 485 n 20.

### III.     CAPITALIZATION-OF-INCOME APPROACH AND OUR ANALYSIS

As an overview of the MTT's application of the capitalization-of-income approach to determine true cash value, the MTT calculated, separately for each of the tax years at issue, the shopping center's potential gross rental income, subtracted vacancy and collection losses, added expense reimbursements, subtracted operating expenses, applied a capitalization rate, and subtracted lease-up costs for purposes of stabilization. Petitioner does not challenge the general or overall formula employed by the MTT in applying the capitalization-of-income approach, as reflected in the mathematical steps outlined in the preceding sentence. Petitioner does, however, allege error with respect to certain amounts and calculations used by the MTT within those steps in the process of determining true cash value. It is important to note that when calculating such items as income, expenses, losses, costs, and reimbursements within the capitalization-of-income approach, appraisers work in terms of projections and estimates in connection with firm assessment dates. In doing so, appraisers take into consideration, in part, market comparables, the history of the assessed property, and financial or other circumstances that actually developed after the assessment date.[2] Here, the assessment date for the 2011 taxes was December 31, 2010, and the assessment date for the 2012 taxes was December 31, 2011. In conducting our analysis, we shall examine each step in the capitalization-of-income formula taken by the MTT in determining true cash value, defining and explaining certain concepts along the way and stopping to entertain and resolve the three particular arguments posed by petitioner on appeal.

### A.     POTENTIAL GROSS RENTAL INCOME

In applying the capitalization-of-income approach, the MTT first found that the shopping center had potential gross rental income in 2011 of $583,920 and potential gross rental income in 2012 of $612,345.[3] In calculating those numbers, the MTT weighed the various market rent comparables proffered by the experts, and the rental space was divided between in-line space

---

[2] Under MCL 211.27(1), an assessor, in determining true cash value, is required to consider "present economic income." MCL 211.27(5) provides, in part:

> "[P]resent economic income" means for leased or rented property the ordinary, general, and usual economic return realized from the lease or rental of property negotiated under current, contemporary conditions between parties equally knowledgeable and familiar with real estate values. The actual income generated by the lease or rental of property is not the controlling indicator of its true cash value in all cases.

[3] The MTT initially indicated that, in using the capitalization-of-income approach to calculate true cash value, the parties' appraisers generally disagreed with respect to virtually all of the variables and numbers utilized in the approach. The MTT found, in general, that petitioner's appraiser's conclusions "regarding rent rates, expenses and expense reimbursements, and capitalization rates [were] better supported and generally more credible."

(space for smaller retailers), which encompassed 34,995 sq. ft. of the 91,845 sq. ft. in total rental space available in the shopping center, and big-box space (anchors, large retailers), which amounted to 56,850 sq. ft. The MTT, in determining the potential gross rental income, calculated income at a rate of $11 per sq. ft. for the in-line space as to both 2011 and 2012, calculated income at a rate of $3.50 per sq. ft. for the big-box space relative to 2011, and calculated income at a rate of $4 per sq. ft. for the big-box space for 2012. Petitioner challenges the $4 per sq. ft. rate in regard to 2012 big-box space. Before launching into petitioner's argument, we must first explain how the MTT settled upon the $4 per sq. ft. rate.

As part of its analysis with respect to examining market rent comparables and projecting income for the in-line and big-box spaces, the MTT referenced "triple net leases." In his appraisal that was admitted into evidence, petitioner's expert stated that a triple net lease is one in which "the tenant reimburses the landlord for their pro-rata share of real estate taxes, insurance, and common-area maintenance [CAM]." These costs are not embedded in the rental rate or payment. On the other hand, a gross lease is a lease in which the landlord agrees to pay the expenses that are normally associated with the property, such as the CAM costs, taxes, and insurance. With a gross lease, a tenant pays only the base rent and does not reimburse the landlord for the tenant's pro-rata share of CAM costs, taxes, and insurance. Both appraisers conducted their respective analyses by using a "triple net lease" standard or framework, making the necessary adjustments for any market rent comparables that involved gross leases. The city's appraiser stated in his appraisal that "[t]he preference was to analyze lease transactions with triple net terms as this is most common in this market." Petitioner's appraiser observed in his appraisal that "adjustments are applied to . . . [gross lease and other] comparables to reflect a triple net expense structure."

In regard to the MTT's reasoning in support of the $3.50 per sq. ft. rate for 2011 and the $4 per sq. ft. rate for 2012 as to the big-box space, the MTT stated:

> With respect to market rents for the big-box space, the Tribunal finds that Petitioner's rent comparables #1 and #4 should be given little weight as neither can be considered an anchor lease since both are stand-alone spaces . . . . The Tribunal further finds that Petitioner's comparable #2 is the lease of 42,000 square feet of the subject space [shopping center] to Family Farm & Home [FF&H] in March 2012. The Tribunal finds that comparables #3 . . . and #5 are comparable to the lease of 56,850 square feet of big-box space at the subject and support unadjusted market rent rates of $6 and $3.67 per square foot[, respectively]. However, as discussed above, Comparable #3 *is not a triple net lease and therefore requires a substantial adjustment for expense reimbursement terms* (as well as sizeable adjustments for location), and, . . . as such, is given minimal consideration by the Tribunal. Based primarily on comparable #5, which required minimal adjustments, the Tribunal finds that Petitioner's appraiser's concluded market rent of $3.50 for the 2011 tax year is credible and supported by the evidence and testimony presented [this calculation is not challenged on appeal]. *However, after giving consideration to the lease of 42,000 square feet of space at the subject to [FF&H] for $4.2[7] per square foot, just three months after the December 31, 2011 assessment date, the Tribunal finds that an increase*

*in market rent per square foot to $4 for big-box space as of the December 31, 2011 assessment date is supported by the evidence.* [Emphasis added.]

Petitioner's first argument on appeal concerns the calculation of potential gross rental income for 2012 relative to the big-box space and the MTT's use of $4 per sq. ft., which, as just quoted, was predicated on the rental rate charged to FF&H of $4.27 per sq. ft.[4] Petitioner argues that the MTT mistakenly proceeded on the basis that the FF&H lease was a triple net lease and not a gross lease. Petitioner maintains that this mistake overinflated the "potential gross rental income" figure, which in turn increased the true cash value and TV. Petitioner contends that the MTT, in a different part of its analysis, had calculated "expense reimbursements" of slightly more than $1 per sq. ft. According to petitioner, because petitioner would not actually enjoy any expense reimbursements for CAM, taxes, and insurance under a gross lease and because a "triple net lease" rate was the projection standard being employed by the MTT in the appraisal approach, an adjustment was absolutely necessary in regard to the FF&H lease. Petitioner argues that the $1 per sq. ft. expense reimbursement rate should have been subtracted from the $4.27 per sq. ft. "gross lease" rate under the FF&H lease as a necessary adjustment in order to produce a rate that was reflective of a "triple net lease" rate, thereby reducing the rate to $3.27 per sq. ft.[5] To be clear, petitioner does not seek implementation of the $3.27 sq. ft. rate for 2012 big-box space instead of the $4 sq. ft. rate actually utilized by the MTT. Rather, petitioner contends that, consistent with its proofs and arguments presented below that contemplated *all* of its proffered comparables as adjusted to reflect "triple net lease" rates, only one of which was the FF&H lease, the MTT should have continued employing the $3.50 per sq. ft. rate that it had used in calculating the potential gross rental income for the big-box space in 2011.

Indisputably, the evidence established that the FF&H lease was a gross lease and not a triple net lease. As reflected in the passage quoted earlier, the MTT itself recognized that a substantial rate adjustment would be necessary due to expense-reimbursement issues if a comparable rental property did not involve a triple net lease. Given the framing of its opinion and judgment, it appears that the MTT operated on the mistaken belief that the FF&H lease was a triple net lease. Clearly, the MTT intended to utilize a "triple net lease" standard and associated rental rates.

The MTT's *apparent* inconsistent approach with respect to triple net and gross leases reflected the adoption of wrong principles and is analogous to the problematic approach taken by

---

[4] In its findings of fact, the MTT stated that, as to the FF&H lease, it was entered into on March 27, 2012, and "[t]he effective lease rate (net of tenant improvements and commissions) was $4.27 per square foot." The record indicates that the rental rate for FF&H was $5.22 per sq. ft., which was adjusted downward to $4.27 per sq. ft. after subtracting $.95 per sq. ft. for costs associated with tenant improvements and leasing commissions. Tenant improvements and commissions are discussed in more detail below.

[5] As indicated in the MTT's discussion, petitioner's appraiser used the FF&H lease as one of his big-box market rent comparables, and he actually set the rental rate at $3.32 per sq. ft. in his appraisal after making an adjustment.

the MTT in *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App 379, which resulted in a reversal and remand. This Court explained:

> [T]he Tax Tribunal expressed an intent in its original opinion to use "gross" (rated) rather than "effective" capacity so as to render its formula "age and condition neutral" with regard to the machinery at the integrated steel mill. However, the formula ultimately adopted by the Tax Tribunal appears to use capacity levels at different stages of production and mixes "rated" and "effective" capacities. Indeed, GLD itself argues on appeal that the Tax Tribunal used the "effective" crude steel capacity for WCI and Weirton, but the "rated" capacity of the hot strip mill for GLD. The Tax Tribunal's adoption of an approach for comparing properties on the basis of different units of measurement further buttresses our conclusion that the Tax Tribunal's formula does not establish a reasonable, well-supported conclusion for true cash value. [*Id.* at 410-411.]

We similarly hold that reliance on a "gross lease" rate, absent adjustment, when a "triple net lease" rate is the standard intended to be employed in determining potential gross rental income and ultimately true cash value, fails to establish a reasonable, well-supported conclusion for the shopping center's true cash value in 2012. Our hesitancy here arises out of uncertainty about the MTT's analysis. The MTT never expressly stated that it found the FF&H lease to be a triple net lease, nor did it indicate that the FF&H lease was not a gross lease. The MTT, in calculating the rental rate for 2012 big-box space, used a $4 per sq. ft. rate and not the entire $4.27 per sq. ft. rate under the FF&H lease. Perhaps the MTT decreased the rate on the unexpressed basis that the FF&H lease was a gross lease, although this would not explain the limited extent of the decrease given the expense reimbursement rate of about $1 per sq. ft. We also note that the MTT stated that it was "giving consideration to the [FF&H] lease" when setting the $4 per sq. ft. rate, which did not necessarily mean that it was the "only" consideration in setting the rate. The problem is that the MTT did not identify any other "consideration," and the MTT had expressly ruled that it gave "no weight" to the city's appraiser's opinion that the rent rate for big-box space in 2012 should be $6 per sq. ft. If indeed the MTT relied solely on the $4.27 per sq. ft. lease rate under the FF&H lease in setting the $4 per sq. ft. rate for 2012 big-box space on the belief that the FF&H lease was a triple net lease, this would amount to the adoption of a wrong principle necessitating reversal. Remand is necessary for purposes of allowing the MTT to provide clarity on the matter. We shall now address the city's arguments on this issue in the context of an assumption that the MTT did adopt a wrong principle.

The city argues that the MTT increased the rate for big-box space from $3.50 per sq. ft. to $4 per sq. ft. on the basis of a growing and strengthening economy; however, nowhere in the opinion and judgment is there support for such a contention. Indeed, the gist of the city's response to petitioner's appeal is that there were sound reasons and supporting evidence for using the $4 per sq. ft. rate. And while perhaps this is true, the city's argument is pure speculation, as the MTT did not voice any of the reasons or cite any of the evidence set forth by the city in deciding upon the $4 per sq. ft. rate. Instead, as gleaned from the opinion and judgment, the MTT only referenced the FF&H lease as the basis for the $4 per sq. ft. lease rate.

We emphasize that we are not directing the MTT on remand to adjust the 2012 big-box rate to $3.50 per sq. ft., nor are we precluding it from once again using the $4 per sq. ft. rate. Rather, the MTT must provide some clarity as discussed earlier and must set the lease rate as

supported by the evidence, keeping in mind and recognizing the true nature of the FF&H lease as a gross lease and not a triple net lease.

B.     VACANCY AND COLLECTION LOSSES; EXPENSE REIMBURSEMENTS; AND OPERATING EXPENSES

The MTT next subtracted vacancy losses and collection losses from the shopping center's potential gross rental incomes, and it then added expense reimbursements for 2011 and 2012, resulting in a determination that the shopping center had a projected total gross income of $585,008 in 2011 and $609,645 in 2012. The MTT then subtracted the shopping center's estimated operating expenses for 2011 and 2012, resulting in a net operating income of $421,873 in 2011 and $445,988 in 2012. No appellate arguments are raised directly regarding these calculations. But of course, the amounts for 2012 may have to be recalculated on remand depending on the MTT's reexamination of the potential gross rental income in 2012 in relation to the square footage lease rate for the big-box space.

C.     APPLICATION OF CAPITALIZATION AND TAX RATES; STABILIZATION AND LEASE-UP COSTS

The MTT next divided the shopping center's net operating incomes ($421,873 in 2011 and $445,988 in 2012) by the shopping center's combined capitalization rate and tax rate, 12.47 percent, thereby producing a "stabilized" true cash value in 2011 of approximately $3,383,100 and a "stabilized" true cash value in 2012 of approximately $3,576,500.[6] The MTT, however, continued by finding that because the shopping center was in fact not stabilized during the 2011 and 2012 tax years, i.e., it was not operating at typical market occupancy levels, it was necessary to account for stabilization, or the lack thereof, in calculating the true cash values for those years. The typical market vacancy rate was 15 percent (85 percent occupancy rate), but the shopping center was only 21.4 percent occupied on the assessment dates of December 31, 2010, and December 31, 2011. To account for stabilization and reach true cash values, the MTT subtracted lease-up costs, under which category the MTT deducted lost rent (unrented space), expense recovery losses, and tenant improvements and leasing commissions.[7] Tenant improvements are

---

[6] A commercial property is "stabilized" when it is operating at typical market occupancy levels based on the typical vacancy rate in the market. Thus, the stabilized true cash value would reflect the shopping center's value if it were operating at typical market occupancy levels.

[7] A concise explanation of lease-up costs was provided by petitioner's appraiser in his written appraisal:

> In order to determine the market value as is, lease-up costs must be deducted from the indicated value as stabilized estimated via the direct capitalization method. Lease-up costs include lost rental income attributable to vacant suites, unrecovered expenses such as real estate taxes, insurance, and common area maintenance, . . . tenant improvement allowance, and leasing commissions. For example, in order to lease up a vacant suite, a potential buyer would consider the lost income during the time it takes to lease the space, the loss of expense reimbursement income from the tenant of that suite, . . . and additional

generally construction-related expenses that a landlord incurs in preparing a space to fit the occupancy needs of a new tenant. And of course, leasing commissions are an expense related to using realtors or other professionals in locating prospective tenants and closing leases with them.

With respect to tenant improvements and leasing commissions, which were combined by the MTT under the lease-up costs' category, the MTT subtracted $54,000 from the stabilized true cash values for both 2011 and 2012. The amount was calculated for both years under a formula that multiplied 56,850 sq. ft. of space by a cost of $.95 per sq. ft. (equaling the $54,000 cost amount). As part of the underlying basis of that calculation, the MTT took into consideration $200,000 in tenant-improvement and leasing-commission costs that petitioner actually incurred in leasing approximately 42,000 sq. ft. of the shopping center to FF&H in 2012 under a five-year lease. The $.95 per sq. ft. rate that was multiplied by 56,850 sq. ft. was apparently derived pursuant to a formula in which the MTT amortized the $200,000 in tenant improvements and leasing commissions over the five years of the FF&H lease, and then divided that amortized amount by the square footage leased to FF&H ($200,000 ÷ 5 yrs. = $40,000 per year ÷ 42,000 sq. ft. = $.95 per sq. ft. [rounded off]).

On appeal, petitioner challenges the MTT's determination to subtract only $54,000 in lease-up costs for 2011 and 2012 associated with tenant improvements and leasing commissions and, more particularly, petitioner criticizes the MTT's employment of amortization in making the calculations. Petitioner contends that the MTT should have simply used the $200,000 in tenant improvements and leasing commissions, unamortized, for purposes of determining related lease-up costs ($200,000 ÷ 42,000 sq. ft. = $4.76 per sq. ft. x 56,850 sq. ft. = $270,606). Accordingly, petitioner maintains that it was entitled to a $270,606 deduction for lease-up costs associated with tenant improvements and leasing commissions for tax years 2011 and 2012, not just $54,000. Petitioner contends that the MTT's use of an amortized rate of $.95 per sq. ft. (resulting in $54,000 in costs) instead of an unamortized rate of $4.76 per sq. ft. (resulting in $270,606 in costs), effectively applied only *one-fifth* of the tenant improvements and leasing commissions a prospective purchaser of the shopping center would have had to incur in 2011 or 2012.

We fail to understand why the MTT would have amortized the $200,000 in tenant improvements and leasing commissions associated with the FF&H lease; the MTT provided no explanation. The city argues that one of petitioner's own witnesses, a property manager for the shopping center, testified about amortizing the $200,000 in tenant improvements and leasing commissions. However, on close inspection of the testimony, the witness was speaking of amortization in connection with addressing the costs and economics of the lease transaction with FF&H and determining the gross lease rate ($5.22 per sq. ft. – $.95 per sq. ft. as amortized =

expenses for tenant improvements and leasing commissions. It is important to consider these costs as a potential investor in the subject would also consider them when determining a price they are willing to pay for the subject at its current occupancy level.

$4.27 per sq. ft.; see footnote 4 above). The witness was not testifying about amortizing the $200,000 in tenant improvements and leasing commissions for purposes of calculating lease-up costs in connection with determining the property's true cash value after stabilization.[8] Petitioner's appraiser opined that it was appropriate to consider the full cost of tenant improvements and leasing commissions upfront in a "lump sum," as a prospective purchaser would not realistically be able to amortize those costs. We agree with this assessment, and conclude that the MTT adopted a wrong principle. The use of amortization did not result in a reasonable, well-supported conclusion for the shopping center's true cash value. *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 411. We shall, however, entertain some additional arguments posed by the city.

The city vigorously maintains that the $54,000 amount in lease-up costs was reasonably determined, given that, as part of considering stabilization, the 21.4 percent occupancy rate was more fiction than reality, where a prior anchor, while no longer inhabiting space, actually paid rent for the first five months of 2011, and where FF&H, while not signed to a lease on December 31, 2011, actually began renting the space in March of 2012. Initially, we note that the MTT did not state that it amortized the $200,000, or only allowed $54,000 in costs, so as to reflect the "reality" of the shopping center's occupancy levels. Again, the city is offering reasons to affirm that were never uttered by the MTT. Moreover, there was competent, material, and substantial evidence on the record supporting the MTT's findings that the shopping mall had an occupancy rate of 21.4 percent on December 31, 2010 and 2011.[9] We also note that the MTT took into consideration the five months of rental payments in 2011 from the former anchor and the 2012 rental payments from FF&H in calculating the "lost rent" component of lease-up costs.

The city finally maintains that the MTT should have used a yield-capitalization approach instead of a direct-capitalization approach, given that consideration of lease-up costs in the

---

[8] We do note that the matter gives rise to a concern of possible double dipping. In calculating the potential gross rental income as to 2012 for the big-box space, the $5.22 per sq. ft. rental rate under the FF&H lease was reduced to $4.27 per sq. ft. after subtracting $.95 per sq. ft., which amount represented amortization of the $200,000 in tenant improvements and leasing commissions, with the MTT ultimately setting the lease rate at $4 per sq. ft. Thus, consideration of the tenant improvements and leasing commissions, as part of the calculation of potential gross rental income in 2012 relative to big-box space, reduced the potential gross rental income. If petitioner also receives the requested increase for tenant improvements and leasing commissions as part of the analysis of lease-up costs and stabilization, which will reduce the true cash value, it would seem that petitioner would be realizing a double benefit arising out of the same tenant improvements and leasing commissions. Because we are uncertain whether our concern is sound, we at least direct the MTT to address it on remand, applying its expertise to the question.

[9] In its findings of fact, the MTT found that the shopping center was 27 percent occupied, but it later indicated that the shopping center "was only 21.4% occupied on the two assessment dates." The initial reference to a 27 percent occupancy rate was clearly a typographical error, as there was no evidence that the shopping center was ever 27 percent occupied, while the 21.4 percent rate was supported by the record.

direct-capitalization approach results in a "ridiculously large reduction in value." As reflected in the MTT's opinion and judgment, the city's own appraiser, as well as petitioner's appraiser and the MTT, relied on a direct-capitalization approach. Accordingly, the city has waived or abandoned any claim that a yield-capitalization approach should now be used. The city asserts that the MTT was "no doubt aware that applying [the] direct capitalization approach to a non-stabilized income producing property led to wide swings in value that overstate the reduction in value that is attributable to the lease up process." The city is apparently suggesting that the MTT employed amortization of the $200,000 in lease-up costs (those tied to tenant improvements and leasing commissions), and only allowed $54,000 in those costs for the two tax years at issue, because of the MTT's knowledge that the direct-capitalization approach was problematic. The opinion and judgment, however, does not in any way support this proposition, and the city's argument is entirely speculative. More likely, the MTT mistakenly interpreted the testimony of petitioner's property manager.

In sum, in amortizing the $200,000 in tenant improvements and leasing commissions, the MTT failed to apply "an approach that provides the most accurate valuation under the circumstances," *Great Lakes Div of Nat'l Steel Corp*, 227 Mich App at 389, and it adopted a wrong principle, *Mich Props, LLC*, 491 Mich at 527-528. For purposes of clarity on remand, the MTT is to reassess the lease-up costs with respect to tenant improvements and leasing commissions, absent consideration of amortization and consistent with this opinion. But the MTT is still free to set the amount at a lower dollar figure than that argued by petitioner, as long as the MTT can provide a sufficiently sound and legally supportable basis for its calculation.

Next, and again with respect to lease-up costs, in calculating lost rent for unrented space, expense recovery losses, and tenant improvements and leasing commissions, the MTT based its calculations on 56,850 sq. ft., which is equivalent to the amount of big-box space. For purposes of stabilization, the amount of rental space that was not rented out to tenants would ordinarily be considered, but only to the extent of achieving, in this case, a stabilized occupancy rate of 85 percent. Given the 21.4 percent occupancy rate for both tax years, which would amount to 19,655 sq. ft. of space, and considering that to reach 85 percent occupancy (78,068 sq. ft.), 63.6 percent more space would have had to been rented out to tenants, or 58,413 sq. ft., the MTT's reliance on *56,850 sq. ft.* instead of *58,413 sq. ft.* (1,563 sq. ft. difference) in calculating lease-up costs would appear to have been erroneous. Petitioner makes this precise argument in its third and final appellate challenge.[10]

---

[10] We do note that it is unclear whether petitioner extends this particular argument to lease-up costs associated with tenant improvements and leasing commissions, considering that the very formula which petitioner argued in favor of in its second claim of error was based on 56,850 sq. ft. and not 58,413 sq. ft. The $200,000 in tenant improvements and leasing commissions pertained to big-box space and not in-line space, but petitioner's appraiser also presented cost projections for tenant improvements and leasing commissions relative to in-line space. As petitioner does not expressly limit its final argument to lost rent and expense recovery losses, our ruling shall encompass those items along with tenant improvements and leasing commissions.

-11-

The MTT decided to use the amount of big-box square footage, 56,850 sq. ft., in its lease-up calculations, which did not result in achieving an 85 percent stabilized occupancy rate. This resulted in a lower amount of lease-up costs being subtracted from the stabilized true cash values, which in turn ultimately resulted in higher true cash values and TVs. The MTT did find that it was "appropriate to account for stabilization . . . [as] the subject [was] operating below the market in terms of stabilized occupancy."

On its face, the MTT's lease-up calculations based on 56,850 sq. ft. instead of 58,413 sq. ft. – a 1,563 sq. ft. difference – reflected the adoption of a wrong principle. In his appraisal, petitioner's expert added the 56,850 sq. ft. of big-box space to 1,879 sq. ft. (not 1,563) from a particular vacant in-line suite located in the shopping center. In the MTT's opinion and judgment, it expressly rejected "inclusion of 1,879 square feet of in-line space . . . in calculating lease-up costs." The MTT indicated that petitioner's appraiser failed to adequately support or explain why 1,879 sq. ft. of in-line space should be included in calculating lease-up costs. As now recognized and correctly argued by petitioner, only 1,563 sq. ft., not the 1,879 sq. ft. referenced by its appraiser, needed to be added to the 56,850 sq. ft. of big-box space to achieve an 85 percent stabilized occupancy rate. Using 1,879 sq. ft. would have eclipsed the 85 percent mark. However, in light of the fact that the MTT expressly sought stabilization and recognized a 21.4 percent occupancy rate and an 85 percent stabilized occupancy rate, we see no logical reason why it needed to ignore the *entire* 1,879 sq. ft., as opposed to simply limiting it to 1,563 sq. ft., as necessary to achieve an 85 percent stabilized occupancy rate.

We reject the city's argument that we should not remand on this particular matter under the doctrine of *de minims non curat lex*, where the MTT ignored only a very small percentage of the space necessary to stabilize the occupancy of the shopping center. Given that we are already remanding the case for the MTT to address other matters, and considering that, even on this issue alone, the additional lease-up costs for an extra 1,563 sq. ft. are not insubstantial, remand is the proper course of action. We also note that the city apparently agrees with the substance of petitioner's argument, as it provides no counter argument whatsoever on the merits of the claimed error.

## D.    TRUE CASH VALUES

Finally, after subtracting the total lease-up costs from the stabilized true cash values, the MTT determined that the shopping center had a true cash value in 2011 of $2,965,750 and a true cash value in 2012 of $3,019,400. Based on those true cash values, and using the 50 percent assessment rate mandated by the Michigan Constitution and statute, the MTT found that the shopping center had a TV in 2011 of $1,482,875 and a TV in 2012 of $1,509,700. Given our ruling on the appellate issues, the MTT will have to recalculate these numbers after conducting proceedings on remand consistent with this opinion.

## IV.    CONCLUSION

The MTT may have adopted a wrong principle with respect to triple net and gross leases in calculating potential gross rental income for the big-box space as to tax year 2012, which necessitates remand for clarification and/or possible correction. Additionally, the MTT adopted wrong principles in calculating lease-up costs associated with tenant improvements and leasing commissions by using amortization relative to 2011 and 2012, and in calculating lease-up costs

-12-

for both years by failing to consider the full amount of square footage necessary to achieve an 85 percent stabilized occupancy rate.

Accordingly, we reverse and remand to the MTT for further proceedings consistent with this opinion. We do not retain jurisdiction. Having fully prevailed on appeal, petitioner is awarded taxable costs pursuant to MCR 7.219.

/s/ William B. Murphy
/s/ Patrick M. Meter
/s/ Deborah A. Servitto